# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE, )
                     )
   **v.**                 )   **ID No. 1801006136A & B**
                     )   **Cr. A. Nos. IN18-01-0862, 03-1259-60**
**DONMIER S. PETERS,** )
         **Defendant.** )

Submitted: June 22, 2022
Decided: September 30, 2022

## <u>OPINION AND ORDER</u>

*Upon Defendant Donmier Peters' Motion for Postconviction Relief*,
**DENIED**.

Allison J. Abessinio, Esquire, Erik C. Towne, Esquire, Deputy Attorneys General, DEPARTMENT OF JUSTICE, Wilmington, Delaware, for the State of Delaware.

Patrick J. Collins, Esquire, COLLINS & PRICE, Wilmington, Delaware, for Mr. Peters.

**WALLACE, J.**

Donmier Peters has filed a motion under Superior Court Criminal Rule 61 seeking postconviction relief. Mr. Peters' chief complaint is that trial counsel allegedly rendered ineffective assistance, in numerous ways, by: (a) failing to file a motion to suppress Mr. Peters' statements to the police; (b) failing to conduct an effective cross-examination of a witness; (c) failing to seek reinstatement of a previously rejected plea offer; and (d) failing to oppose a habitual sentencing motion.[1] For the reasons below, Mr. Peters' motion for postconviction relief is **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. THE JANUARY 2018 STABBING AND INITIAL INVESTIGATION

At about 11:00 a.m. on January 13, 2018, Corporal Robert Steele, along with other officers of the Wilmington Police Department ("WPD") were sent to the 700 block of Warner Street in response to a reported stabbing.[2] When Cpl. Steele got there, he saw Derrick Edwards "sitting on the step holding his hands up near his throat and a massive amount of blood coming from his throat down his sweatshirt."[3]

---

[1]  Def.'s Mot. for Postconviction Relief at 19, 43, 50, 58, *State v. Donmier Peters*, ID No. 1801006136A (Del. Super. Ct. Feb. 24, 2020) (D.I. 68). Mr. Peters' Possession of a Deadly Weapon by a Person Prohibited charge was bifurcated from his other charges resulting in two case identification numbers. ID Nos. 1801006136A & B. The Court will cite to the docket for ID No. 1801006136A unless otherwise stated.

[2]  Appendix to Def.'s Mot. for Postconviction Relief ("Def.'s App.") at A248-A249, Feb. 24, 2020 (D.I.s 69 & 70).

[3]  *Id.* at A251. While on the street, Cpl. Steele could only see two wounds. The forensic nurse at Christiana Hospital later informed him that Mr. Edwards actually had three: "two to the upper

Mr. Edwards told Cpl. Steele and other officers that he had been stabbed around the corner, and mentioned a "funeral home."[4]

After ensuring Mr. Edwards received immediate medical attention, the police began to search for Mr. Edwards' assailant and for evidence of where the event took place.[5] On the north side of a nearby funeral home there is an alleyway that also functions as a driveway; it parallels the walkway behind the 1200 block of Sycamore Street.[6] WPD Master Corporal Joshua Wilkers saw "a couple drops of blood" at the beginning of that walkway and looked for more drops of blood in the alleyway.[7] As M/Cpl. Wilkers continued down the alleyway he found more blood on the ground, specifically in the rear of 1210 Sycamore Street.[8] Along the walkway, M/Cpl. Wilkers found more drops of blood and bags of heroin.[9] The officer also saw a hat in the alleyway that he believed looked as if it had been recently dropped there.[10]

As he travelled on, M/Cpl. Wilkers saw that in the rear yard of 1210 Sycamore

---

chest/neck area, and one to the left side of the neck." *Id.* at A254, A263. In total, Mr. Edwards suffered "seven incised wounds with five of them being to his neck and throat." *Id.* at A323.

[4]    *Id.* at A254, A329.

[5]    *See id.* at A328-A332.

[6]    *Id.* at A331.

[7]    *Id.* at A332.

[8]    *Id.* at A333.

[9]    *Id.*

[10]    *Id.* at A336.

Street there was flipped-over furniture, a chair with a spot of wet blood, and a "pole with a knife on the end of it."[11]

While M/Cpl. Wilkers was searching the area, a man—later identified as Ted Chapman—who was in the 1210 Sycamore Street residence, opened his door near the alleyway and rear yard to ask the officer what was happening.[12] M/Cpl. Wilkers placed Mr. Chapman in custody because M/Cpl. Wilkers saw blood in the kitchen behind Mr. Chapman, blood on the door handle, and what looked like blood on Mr. Chapman's hands.[13] The officer then "entered . . . and cleared the residence to see if there w[ere] any more possible victims in the house or anybody injured."[14] The house was secured while the police obtained a warrant to search it.[15]

After receiving the warrant, the police searched 1210 Sycamore Street.[16] When doing so they saw blood on the bathroom door and doorknob.[17] In the kitchen, the police found a bloodied dish rag hanging from the sink.[18] Moving further into the house, the police found a blue and white plaid shirt that appeared to have dried

---

[11]  *Id.* at A338.

[12]  *Id.* at A341-A342.

[13]  *Id.* at A342.

[14]  *Id.* at A343.

[15]  *Id.* at A343, A392.

[16]  *Id.* at A392.

[17]  *Id.* at A393-A394.

[18]  *Id.* at A396.

blood on it.[19]  The police then moved on to the bedroom and found a "folding buck knife with a 4-inch blade"—the weapon they deduced had been used to injure Mr. Edwards.[20]

When police interviewed Mr. Chapman, the owner of the 1210 Sycamore Street residence, he gave the police a description of the suspect as "a black male with a short beard" wearing "a blue hoodie, black pants, and [what Mr. Chapman believed were] Air Force One white Nike sneakers."[21]  Mr. Chapman said he knew the suspect as "Lucky."[22]  When the detectives showed him a photo lineup, Mr. Chapman identified Donmier Peters as Mr. Edwards' assailant.[23]  Mr. Chapman told police that "Lucky" (Mr. Peters) was calling him multiple times during the course of his January 13th police interview.[24]

## B. MR. PETERS' ARREST AND QUESTIONING

Further investigation took the police to the 800 block of Wilmington's North Harrison Street the next day.[25]  Upon reaching the residences there, the police

---

[19]  *Id.* at A397-A398.

[20]  *Id.* at A400-A402.

[21]  *Id.* at A514-A515.

[22]  *Id.*

[23]  *Id.* at A209-A210, A518.

[24]  *Id.* at A209, A519.

[25]  *Id.* at A441.

identified and arrested Mr. Peters.[26] During his arrest the police noticed Mr. Peters'

hand was bandaged and in need of medical attention.[27] When later searching his

room at the North Harrison residence,[28] the police found white Nike sneakers and

black sweatpants that matched Mr. Chapman's description of what Mr. Peters was

wearing during the altercation with Mr. Edwards.[29]

After his arrest, the police brought Mr. Peters to the WPD's Criminal

Investigation Division and interviewed him there.[30] Detectives read Mr. Peters his

*Miranda* rights and when asked whether Mr. Peters understood his rights and wished

to speak with the detectives, Mr. Peters, without hesitation, told them: "I was

defending myself."[31] The detectives asked again whether Mr. Peters wanted to speak

with them and he replied: "Yes."[32] According to Mr. Peters, both he and

Mr. Edwards had knives and he stabbed Mr. Edwards in self-defense.[33] At one point

during the interview, Mr. Peters asked to speak with a lawyer and detectives asked

---

[26]  *Id.* at A442.

[27]  *Id.* at A469-A470.

[28]  This search of Mr. Peters' room was done with his consent.  *Id.* at A448-A449, A469.

[29]  *See id.* at A449-A450.

[30]  *See id.* at A25-A26.

[31]  *Id.* at A26.

[32]  *Id.*

[33]  *Id.* at A30, A33.  Mr. Peters stated in the interrogation he was willing to take a lie detector test to prove his self-defense claim.  *Id.* at A36.

if they could obtain a few more answers before calling a lawyer.[34] Mr. Peters agreed.[35] Thereafter, Mr. Peters said that he had purchased the knife he used from Mr. Chapman.[36] He again requested to speak to a lawyer, but continued to answer the detectives' questions.[37] Mr. Peters insisted that he "did not intend for it to go that way."[38] Specifically, while Mr. Peters maintained that he was acting in self-defense, Mr. Peters said that he had brandished his knife to intimidate Mr. Edwards:[39]

| | |
|---|---|
| Mr. Peters: | But I did not intend for it to go that way. You see, man? |
| Detective: | I understand. I get it. |
| Mr. Peters: | I just wanted to intimidate him. |
| Detective: | You know how many times you've said that? |
| Mr. Peters: | You see what I'm saying? I just wanted to intimidate. |
| Detective: | You know how many times you said you didn't think it was gonna go this way? |
| Mr. Peters: | I didn't think that he was gonna actually grab for my—my situation. |

---

[34] *Id.* at A40.

[35] *Id.* at A40.

[36] *Id.* at A45. While initially stating that he had bought the knife from Mr. Chapman a week before the altercation, Mr. Peters later testified at trial that the knife was Mr. Chapman's and that he had lied to protect Mr. Chapman from being a potential accessory. *Id.* at A774.

[37] *Id.* at A48-A49. According to Mr. Peters, some of this recording, including his requests for counsel, were redacted from what was played to the jury. Mot. for Postconviction Relief at 38 n.174. The parties have now relied on the full transcript of the January 14, 2018 custodial interview, including Mr. Peters' requests for counsel. *See* Def.'s App. at A1172-A1202.

[38] Def.'s App. at A52.

[39] *Id.*

Detective: It makes sense.

Mr. Peters: And then all of this come into play. I just brought it out there. It was long enough for it to stick out of my pocket to intimidate. And.

Mr. Peters also told the police that he threw away his sweatshirt in a nearby dumpster; the police couldn't locate that sweatshirt.[40] After the interview, detectives drove Mr. Peters to the hospital to have his hand examined.[41]

While on their way to the hospital, Mr. Peters said, without prompting: "[H]e didn't have a knife."[42] The police believed Mr. Peters to be referring to Mr. Edwards.[43] Later, at the hospital, the police recorded Mr. Peters saying: "[H]e had it, I seen it."[44] The police took this, too, to be Mr. Peters speaking of Mr. Edwards.[45]

## C. MR. PETERS' TRIAL FOR ATTEMPTED MURDER RESULTS IN A VERDICT OF FIRST-DEGREE ASSAULT.

A grand jury returned an indictment against Mr. Peters, charging him with Attempted Murder in the First Degree, Possession of a Deadly Weapon During the

---

[40]  *Id.* at A41, A451, A766.

[41]  *Id.* at A61.

[42]  *Id.* at A477.

[43]  *Id.* Det. Mosley turned in his supplemental police report on October 15, 2018, containing that statement. *Id.* at A74 ("[redacted] did not have a knife . . . ."); Det. Ball also included this statement in his supplemental police report. *Id.* at A68.

[44]  *Id.* at A594. The existence of this police recording wasn't included in either Detective Mosley's or Ball's supplemental police reports. *Id.* at A595.

[45]  *Id.* at A594.

Commission of a Felony ("PDWDCF"), Possession of a Deadly Weapon by a Person Prohibited ("PDWBPP"), and Tampering with Physical Evidence.[46]

Mr. Peters' jury trial was originally slated for November 2018, but was rescheduled due to medical reasons concerning Mr. Peters.[47] The trial then commenced on January 14, 2019.[48] John F. Kirk IV, Esquire represented Mr. Peters at trial and sentencing.[49]

The State's witnesses included Mr. Chapman, Cpl. Steele, M/Cpl. Daniel Vignola, M/Cpl. Wilkers, and Detectives Brandon Mosley, William Ball, and Jose Santana—all of whom serve on the WPD—and Forensic Nurse Examiner Nicole Possenti with the Christiana Care Health System.[50] The defense witnesses included Office of Defense Services criminal investigator Raymond Scott, and Mr. Peters.[51]

The State's first witness was Mr. Chapman, who testified that on January 13, 2018, Messrs. Peters and Edwards knocked on his door.[52] Mr. Peters entered Mr. Chapman's house and asked him for a knife, which Mr. Chapman provided, so

---

[46] Indictment, Mar. 26, 2018 (D.I. 3); Def.'s App. at A22-A24.

[47] D.I. 31.

[48] D.I. 40.

[49] *See* D.I. 5.

[50] Def.'s App. at A123, A274, A368, A508.

[51] *Id.* at A654.

[52] *Id.* at A181, A189-A191.

that Mr. Peters could "cut something."[53] Mr. Chapman then heard "screams from [his] backyard," and when he looked over, he saw Messrs. Peters and Edwards fighting.[54] Mr. Chapman saw that Mr. Peters had a knife in his hand and Mr. Edwards was "trying to block defensively."[55] Mr. Chapman yelled at them and Mr. Edwards tried to run away but Mr. Peters "stabbed him again in the chest."[56] Mr. Peters then came into Mr. Chapman's house, "dropped the knife in the sink . . . and went into the bathroom because . . . he cut his hand."[57] Mr. Chapman rinsed off the dropped knife and put it next to his bed.[58] The police later found this knife in Mr. Chapman's bedroom.[59] After the altercation, Mr. Peters told Mr. Chapman that Mr. Edwards was "going to die . . . [since he] got him good in the throat."[60] Mr. Peters also told Mr. Chapman that Mr. Edwards was "f**king with [his] money."[61]

The State called Dets. Ball, Santana, and Mosley to testify. Det. Ball told the

---

[53] *Id.* at A192-A193.

[54] *Id.* at A194-A195.

[55] *Id.* at A195.

[56] *Id.* at A196.

[57] *Id.* at A201.

[58] *Id.*

[59] *Id.* at A400-A402.

[60] *Id.* at A202.

[61] *Id.*

jury that when the police arrested Mr. Peters, he had an injury on his hand.[62] Det. Santana described the police search of Mr. Peters' room, where they found "a pair of white sneakers and black sweatpants with a white drawstring, and these were consistent with what the suspect in this case was supposed to be wearing."[63] Det. Mosley detailed Mr. Peters' statements during the interrogation.[64] And Det. Ball recounted Mr. Peters' statements on the drive to Wilmington Hospital, including Mr. Peters' statement that Mr. Edwards "didn't have a knife."[65]

After the State rested, the Defense presented its case that included calling Mr. Scott and Mr. Peters as witnesses.[66]

Mr. Scott testified that he had interviewed Mr. Chapman about a month after the January 13, 2018 altercation.[67] Mr. Scott said Mr. Chapman denied giving Mr. Peters a knife and never mentioned anything about owing Mr. Peters money.[68] Additionally, Mr. Scott recalled Mr. Chapman saying that when Mr. Peters was at his Sycamore Street home on January 13th, Mr. Peters asked only if he could use

---

[62]   *Id.* at A469-A470.

[63]   *Id.* at A449.

[64]   *Id.* at A612.

[65]   *Id.* at A477.

[66]   *Id.* at A654.

[67]   *Id.* at A657.

[68]   *Id.* at A659.

Mr. Chapman's bathroom.[69]  According to Mr. Scott, Mr. Chapman never described hearing any yelling outside his residence that day.[70]

Mr. Scott said he interviewed Mr. Chapman again on March 15, 2018, and Mr. Chapman's statements were consistent with his earlier interview.[71]  Mr. Scott attempted to interview Mr. Chapman for a third time in August 2018, but couldn't locate him.[72]

Mr. Peters also testified in his own defense.[73]  Before Mr. Peters testified, the Court informed him of his constitutional right to testify or not to testify in his own defense.  Mr. Peters understood and took the stand.[74]

Mr. Peters told the jury that he owed the victim, Mr. Edwards, about $450, and that Mr. Edwards wanted to collect that debt.[75]  According to Mr. Peters, after he told Mr. Edwards he had no money to give, Mr. Edwards grabbed him and made "outbursts."[76] Then, said Mr. Peters, Mr. Edwards "pulled this weapon out," a "mini ice pick"-type weapon, and threatened him by stating "8th and Harrison," the block

---

[69]  *Id.* at A659-A660.

[70]  *Id.* at A660.

[71]  *Id.* at A660-A661.

[72]  *Id.* at A661.

[73]  *Id.* at A702.

[74]  *Id.* at A702-A704.

[75]  *Id.* at A709-A710.

[76]  *Id.* at A711.

Mr. Peters and his mother lived on.[77] Mr. Peters said he then told Mr. Edwards that Mr. Chapman owed him money and they should go to Mr. Chapman's residence to get that money for Mr. Edwards.[78] During the walk to Mr. Chapman's residence, Mr. Peters supposedly got the ice pick-type weapon from Mr. Edwards, and tossed it on the ground.[79] When Mr. Edwards asked for that first weapon back, Mr. Peters said he didn't have it, and Mr. Edwards told Mr. Peters he had another weapon (a screwdriver-type weapon) on him.[80]

Mr. Peters said he arrived at Mr. Chapman's house and entered without Mr. Edwards.[81] At Mr. Chapman's place Mr. Peters could not find money, but didn't want to run because Mr. Edwards knew where he lived.[82] So he asked Mr. Chapman for a knife, which Mr. Chapman gave him, and which Mr. Peters put in his pocket.[83] Mr. Peters said that when he returned Mr. Edwards was calm at first but then "lunged" at him with the "small screwdriver looking thing."[84] Mr. Peters claims he disarmed Mr. Edwards, but then Mr. Edwards grabbed Mr. Peters and the knife in

---

[77]   *Id.* at A714-A715.

[78]   *Id.* at A716.

[79]   *Id.* at A720-A722.

[80]   *Id.* at A723, A746-A747.

[81]   *Id.* at A724-A725.

[82]   *Id.* at A728-A730.

[83]   *Id.* at A735-A738.  Mr. Peters said he asked for a knife because Mr. Edwards "was a physical threat."  *Id.* at A736.

[84]   *Id.* at A741-A744, A746-A747.

his right pocket.[85]  In the ensuing fight, Mr. Edwards bit Mr. Peters' hand and "bum-rushed" him into the steps.[86]  Mr. Peters then stabbed Mr. Edwards with the knife multiple times, and "headbutt[ed]" Mr. Edwards.[87]

Mr. Edwards eventually ran away.[88]  Mr. Peters returned to Mr. Chapman's residence and asked him for rubbing alcohol.[89]  Mr. Peters stated that both his knife and Mr. Edwards's ice pick were dropped in the alleyway and that he returned there later that night to put the weapons and his blood-soaked sweatshirt in a dumpster.[90]

The jury found Mr. Peters guilty of Assault First Degree (as a lesser included offense of the attempted murder), Possession of a Deadly Weapon During the Commission of a Felony, and Tampering with Physical Evidence.[91]  Later that same day, the jury also found Mr. Peters guilty of a single charge of Possession of a Deadly Weapon by a Person Prohibited—that count had been severed from the others pre-trial.[92]

---

[85]  *Id.* at A747-A748.

[86]  *Id.* at A750.

[87]  *Id.* at A752-A753.

[88]  *Id.* at A757.

[89]  *See id.* at A761.

[90]  *Id.* at A762, A765-A766.  This contradicted Mr. Chapman's testimony.  *Id.* at A201.

[91]  *Id.* at A1154, A1156-A1157.

[92]  *Id.* at A1167.

## D. Mr. Peters' Habitual Criminal Sentencing and Appeal

After the jury verdict, the State moved to have Mr. Peters declared a habitual criminal offender under 11 *Del. C.* § 4214(c).[93] The Court granted that motion[94] and subsequently imposed a 50-year sentence of imprisonment comprised of two separate minimum-mandatory terms.[95]

Mr. Peters appealed his convictions to the Delaware Supreme Court, but later voluntarily dismissed that appeal.[96] He then brought this motion under Rule 61 via his appointed postconviction counsel.[97]

## II.  THE POSTCONVICTION MOTION

## A. Mr. Peters' Motion Can Be Considered on Its Merits.

Delaware courts must consider Criminal Rule 61's procedural requirements before addressing any substantive issues.[98] The Rule 61 procedural bars are "timeliness, repetitiveness, procedural default, and former adjudication."[99]

Less than a year after his judgment of conviction became final, Mr. Peters

---

[93]  *Id.* at A1215; D.I. 46.

[94]  Def.'s App. at A1217; D.I. 48.

[95]  Def.'s App. at A1227.

[96]  *Id.* at A1237; D.I. 67.

[97]  D.I. 68.

[98]  *Maxion v. State*, 686 A.2d 148, 150 (Del. 1996); *State v. Jones*, 2002 WL 31028584, at *2 (Del. Super. Ct. Sept. 10, 2002).

[99]  *State v. Stanford*, 2017 WL 2484588, at *2 (Del. Super. Ct. June 7, 2017) (citations omitted).

timely filed his Rule 61 motion.[100] This is his first postconviction motion, so it is not repetitive.[101] As all Mr. Peters' claims for relief allege ineffective assistance of counsel, which generally cannot be raised on direct appeal, he is neither procedurally barred from raising them in this collateral proceeding, nor have they been formerly adjudicated.[102]

Accordingly, the Court will address the merits of Mr. Peters' postconviction claims.

## B. MR. PETERS' POSTCONVICTION CLAIMS

Mr. Peters says his trial counsel provided ineffective assistance by:

(1)     [F]ailing to file a motion to suppress Mr. Peters' statements to police, as Mr. Peters invoked his rights to remain silent and to counsel several times during the interrogation.[103]

(2)     [F]ailing to conduct an effective cross-examination of Theodore Chapman regarding his prior inconsistent statements.[104]

(3)     [F]ail[ing] to seek reinstatement of a previously rejected plea offer after the State provided very late supplemental discovery of a statement allegedly made by Mr. Peters, causing prejudice.[105]

---

[100] Mr. Peters' Motion for Postconviction Relief was filed on February 24, 2020. D.I. 68. His sentence was signed and filed on June 26, 2019. D.I. 49. *See* Super Ct. Crim. R. 61(m)(1).

[101] *See* D.I. 68.

[102] *Stanford*, 2017 WL 2484588, at *3.

[103] Mot. for Postconviction Relief at 19; *see also* Def.'s Suppl. Mot. at 2-5, May 14, 2021 (D.I. 84).

[104] Mot. for Postconviction Relief at 43.

[105] *Id.* at 50. Mr. Peters has withdrawn this claim. *See* Def.'s Suppl. Mot., 6-7 ("the claim that trial counsel should have filed a motion to force the State to reoffer the reject plea is withdrawn."). The State has no objection to the claim's withdrawal and did not address the merits in its supplemental response. *See* State's Suppl. Resp., Jun. 17, 2021 (D.I. 85).

(4)     [F]ailing to oppose the State's habitual sentencing motion, as Mr. Peters was continuously incarcerated between convictions that formed the basis for the petition, with no opportunity for rehabilitation . . . .[106]

And he includes a fifth claim that the "cumulative nature of the prejudice in this case requires postconviction relief . . . ."[107]

## III.  APPLICABLE LEGAL STANDARDS

A movant who claims ineffective assistance of counsel must demonstrate that: (a) his defense counsel's representation fell below an objective standard of reasonableness, and (b) there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different.[108]

There is a strong presumption that counsel's representation was reasonable,[109] and "[i]t is not this Court's function to second-guess reasonable trial tactics" engaged by trial counsel.[110]  Too, one claiming ineffective assistance "must make specific allegations of how defense counsel's conduct actually prejudiced the proceedings, rather than mere allegations of ineffectiveness."[111]  A movant must satisfy both

---

[106]  Mot. for Postconviction Relief at 58.

[107]  *Id.* at 72.

[108]  *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *see also Alston v. State*, 2015 WL 5297709, at *2-3 (Del. Sept. 4, 2015).

[109]  *See Wright v. State*, 671 A.2d 1353, 1356 (Del. 1996).

[110]  *State v. Drummond*, 2002 WL 524283, at *1 (Del. Super. Ct. Apr. 1, 2002).

[111]  *Alston*, 2015 WL 5297709, at *3 (citing *Wright*, 671 A.2d at 1356); *Monroe v. State*, 2015 WL 1407856, at *5 (Del. Mar. 25, 2015) (citing *Dawson v. State*, 673 A.2d 1186, 1196 (Del. 1996)).

-16-

prongs—deficient attorney performance and resulting prejudice—to succeed in making an ineffective assistance of counsel claim.[112] Failure to do so on either prong will doom the claim, and the Court need not address the other.

## IV. DISCUSSION

### A. CLAIM I – THE ABSENCE OF A MOTION TO SUPPRESS

Mr. Peters claims WPD detectives violated his *Miranda*[113] rights and that trial counsel should have moved to suppress his interrogation as there is a reasonable likelihood such a motion would have been granted by the Court.[114] More specifically, in his supplemental filings, Mr. Peters maintains that trial counsel was ineffective by failing to suppress the following three statements: (1) "I was defending myself;" (2) "I wasn't honest about everything" . . . "[the victim] didn't have a knife;" and, (3) his description of the victim's weapon as an ice pick or awl.[115] By not doing so, says Mr. Peters, trial counsel's representation was constitutionally defective.[116]

---

[112] *Strickland,* 466 U.S. at 694; *Ploof v. State*, 75 A.3d 811, 825 (Del. 2013) ("*Strickland* is a two-pronged test, and there is no need to examine whether an attorney performed deficiently if the deficiency did not prejudice the defendant." (citation omitted)); *State v. Hamby*, 2005 WL 914462, at *2 (Del. Super. Ct. Mar. 14, 2005).

[113] *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966) (requiring the police to inform a suspect in custody of certain rights that protect him or her from self-incrimination).

[114] Mot. for Postconviction Relief at 36.

[115] Def.'s Suppl. Mot. at 2-5.

[116] *Id.*

In order to succeed on his claim, Mr. Peters must show that: (a) his defense counsel's representation fell below an objective standard of reasonableness, and (b) there is a reasonable probability that but for counsel's errors, the result of his trial proceeding would have been different.[117] Mr. Peters has a "heavy burden" in proving the first *Strickland* prong (counsel deficiency) as there is a "strong presumption that trial counsel's representation was professionally reasonable."[118] When an attorney makes a strategic choice based on a "thorough investigation of law and facts" his decisions are "virtually unchallengeable."[119] Moreover, given Mr. Peters' self-defense claim and the well-settled principles of *Miranda*, each of his now-challenged statements would have been nonetheless admissible. So, trial counsel could not have been ineffective for failing to try to suppress them.

### 1. MR. PETERS KNOWINGLY, VOLUNTARILY, AND INTELLIGENTLY WAIVED HIS *MIRANDA* RIGHTS.

After his arrest, the police brought Mr. Peters to the police station for an interview.[120] Detectives read Mr. Peters his *Miranda* rights and when asked whether Mr. Peters understood those rights and wished to speak with the detectives, Mr. Peters without hesitation told them: "I was defending myself."[121] The detectives

---

[117] *Strickland*, 466 U.S. at 694; *see also Alston*, 2015 WL 5297709, at *2-3.

[118] *Hoskins v. State*, 102 A.3d 724, 730 (Del. 2014) (citations omitted).

[119] *Id.* (quotation marks and citations omitted).

[120] Def.'s App. at A25-A26.

[121] *Id.* at A26.

asked again whether Mr. Peters wanted to speak with them and he replied: "Yes."[122]

Mr. Peters posits this exchange was not a waiver of his *Miranda* rights.[123] And he insists "I was defending myself" should have been suppressed because the totality of the circumstances surrounding its utterance indicates he "was not fully aware of the nature of the rights being abandoned and the consequences" thereof when he said those words.[124] Mr. Peters tries to distinguish his statement from that given in *Hubbard v. State*, where our Supreme Court found the contested post-*Miranda* statements were made knowingly, intelligently, and voluntarily.[125]

The defendant in *Hubbard* argued that given the totality of the circumstances,[126] his *Miranda* waiver was invalid because: (1) the questioning detective "rapidly" read him his rights; (2) the detective failed to "more affirmatively ascertain" whether Hubbard was willing to give a statement; and, (3) the questioning detective failed to properly determine Hubbard's competency to waive his rights due

---

[122] *Id.*

[123] Def.'s Suppl. Mot. at 2-3.

[124] *Id.* at 3.

[125] *Id.* (citing *Hubbard v. State*, 16 A.3d 912 (Del. 2011)).

[126] The "totality of the circumstances" test was established in *Moran v. Burbine*, 475 U.S. 412, 421 (1986). To determine whether one has effectively waived his or her *Miranda* rights, the two-part test requires the waiver to be (1) voluntary, and (2) made with a "full awareness" of the nature of the rights being abandoned as well as the attendant consequences. *Id.* "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* Delaware has adopted this test. *See Marine v. State*, 607 A.2d 1185, 1195-96 (Del. 1992).

to Hubbard's alleged intoxication from the previous evening.[127] Particularly at issue there—and the distinction raised by Mr. Peters here—was Hubbard's response to the detective's question as to whether he wanted to talk. When asked, Hubbard blurted: "Yeah. I was with I was with a girl. Yeah."[128] After considering both his verbal responses and physical actions, our Supreme Court found Hubbard's answer a voluntary *Miranda* waiver given his responses to "several hundred questions" thereafter, his express acknowledgement that he understood his rights, his age of twenty-seven years, and his "significant experience with the criminal justice system."[129]

Here, Mr. Peters advances the same unsuccessful *Miranda*-waiver arguments addressed in *Hubbard*. And here, those arguments are equally unpersuasive. Given the totality of the circumstances in this case, Mr. Peters' post-*Miranda* affirmative responses to continue with police questioning show a valid waiver of his rights, and his statement "I was defending myself" followed by an unequivocal "yes" is no different than the *Hubbard* scenario.

First, and unlike Hubbard, Mr. Peters doesn't allege to have been under the influence of any alcohol or drugs when the statement was made. Second, Mr. Peters

---

[127] *Hubbard*, 16 A.3d at 914.

[128] *Id.* at 916.

[129] *Id.* at 918-19.

-20-

was emphatic in his affirmative responses to speak with the detectives after his *Miranda* warnings were given: he instantaneously responded "yes," and "yes, sir," and was immediately forthcoming that he was defending himself.[130] Third, though Mr. Peters was only twenty-one years old, he had significant experience with the criminal justice system—both as a juvenile and as an adult.[131] Prior to the instant case, Mr. Peters had been arrested no less than thirteen times.[132] No doubt many of those arrests included the receiving of *Miranda* warnings and the potential for post-arrest interviews. And, there's no evidence of any police coercion prompting Mr. Peters' responses. Indeed, the detectives clarified with Mr. Peters several times to insure they were respecting his *Miranda* rights:

> Detective: Having these rights in mind, do you wish to speak with me now?
>
>       *                *                *
>
> Detective: Hang on before you get started. You just got to tell him yes or no.
>
>       *                *                *
>
> Detective: So you wish to talk to me?[133]

The totality of the circumstances here weighs in favor of a knowing and voluntary *Miranda* waiver.

---

[130] Def.'s App. at A26-A27.

[131] *Id.* at A1205-A1211.

[132] *Id.*

[133] *Id.* at A26. Too, there was no *Miranda* violation when Mr. Peters, spontaneously stated, during his police transport to the hospital, that he "wasn't honest" about everything and the victim "didn't have a knife." *Id.* at A476-A477, A592.

What's more, Mr. Peters' words and actions demonstrate he undoubtedly understood his *Miranda* rights—not long after his statement claiming self-defense, he then asked to speak with a lawyer.[134] Though the questioning did not immediately cease upon his request for counsel—and this lends some weight to a suppression argument aimed at those additional statements—it is difficult to discern any harm therefrom as they too are just further protestations of self-defense.[135]

Mr. Peters' eventual invocation of his right to counsel and the totality of the circumstances show that Mr. Peters was aware of the nature of his rights being abandoned. He knowingly, voluntarily, and intelligently waived his *Miranda* rights and his statement "I was defending myself" was properly admissible.

### 2. MR. PETERS' STATEMENTS "I WASN'T HONEST ABOUT EVERYTHING," "HE DIDN'T HAVE A KNIFE," AND THE WEAPON WAS MORE LIKE "AN ICE PICK" WOULD NOT HAVE BEEN EXCLUDED.

Mr. Peters alleges that had his entire custodial interview been suppressed, his later, spontaneous statements also would have been excluded.[136] According to

---

[134] *Id.* at A40. When Mr. Peters continued to ask the detectives questions thereafter, the police interrupted him three times to honor his request for counsel. *Id.*

Detective:    So you need to speak with a lawyer?

&ast;                    &ast;                    &ast;

Detective:    Do you want to do that before we keep talking?

&ast;                    &ast;                    &ast;

Detective:    So you don't want the lawyer until we finish with this?

[135] *Id.*

[136] Def.'s Suppl. Mot. at 4.

Mr. Peters, the later statements would have been excluded not because of any constitutional or statutory violation but because reference to the presence of or honesty about a knife would have no relevance to the State's case-in-chief, and so unfair prejudice would result from these admissions.[137] In Mr. Peters' view, the admission of these standalone, later statements would only confuse and mislead the jury.[138]

At the outset, and as Mr. Peters concedes, even if his entire custodial interview was suppressed, his later statements aren't subject to any constitutional challenge.[139] "When there is no police interrogation and the Defendant proffers statements spontaneously, there is deemed to be no custodial interrogation and the statements are then admissible."[140] At the conclusion of his initial custodial interview, the interrogating detectives transported Mr. Peters to the hospital for treatment of his hand injury. Enroute, Mr. Peters spontaneously offered that he wasn't honest about everything, and that the victim didn't have a knife.[141] These statements were not the result of police coercion or questioning but instead were made of his own volition. Indeed, his statements would have been admissible because they *were* unprompted,

---

[137] *Id.*

[138] *Id.*

[139] *Id.* ("Mr. Peters' alleged utterance in the police car would be admissible if it were not the product of additional police questioning and was truly spontaneous.").

[140] *State v. DeAngelo*, 2000 WL 305332, at *11 (Del. Super. Ct. Mar. 21, 2000) (citation omitted).

[141] Def.'s App. at A592.

-23-

spontaneous utterances that were the product of free and deliberate choice. Accordingly, there is no *Miranda* violation, nor any constitutional or statutory bar to use of his statements at trial.

But, suggests Mr. Peters, if the entire police station statement was suppressed, his later, spontaneous statements would have been irrelevant.[142]

> Relevant evidence is defined as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. To be considered relevant, the purpose for which the evidence is offered must be material and probative.[143]

Certainly, Mr. Peters can't be saying that his own admission that the victim was unarmed when stabbed wouldn't make a consequential fact in his attempted murder trial more or less probable. No, it appears Mr. Peters instead is suggesting that this otherwise relevant admission by him could be excluded on some other basis.

Our rules of evidence permit the Court to exclude otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence."[144]

To be sure, Mr. Peters' spontaneous statements are relevant all on their own.

---

[142] Def.'s Suppl. Mot. at 4.

[143] *Hansley v. State*, 104 A.3d 833, 837 (Del. 2014) (quotation marks and citations omitted); *see also* D.R.E. 401.

[144] *Hansley*, 104 A.3d at 837-38 (quoting D.R.E. 403).

They demonstrate he knew of and was involved in the confrontation with Mr. Edwards, and they suggest he used self-defense in the physical encounter.[145]

Mr. Peters' postconviction counsel believes that he could have kept every self-incriminatory word uttered by Mr. Peters from the jury and then successfully pursued an identity/reasonable doubt defense. Fully informed and prepared trial counsel didn't think so. And given the strength of the evidence of Mr. Peters stabbing Mr. Edwards, trial counsel reasonably believed self-defense—which Mr. Peters had been proclaiming since day one—was the best option.

Trial counsel was not ineffective for failing to suppress the words Mr. Peters said enroute to the hospital because they were material and probative of his self-defense claim. He was charged with attempted homicide, and the State surely would have been able to introduce these statements that evidenced Mr. Peters' knowledge of and involvement in that crime. In the face thereof, a claim of self-defense and Mr. Peters' statements about the deadly instrument he was protecting himself from were helpful to the defense. So counsel can hardly be faulted for weighing the benefit of inclusion versus exclusion and opting to include these statements so as to forward Mr. Peters' self-defense claim.

And as Mr. Peters must admit, the trial judge properly found that his statement

---

[145] Def.'s App. at A593-A595.

describing the victim's weapon as an ice pick or awl rather than a knife was admissible and relevant.[146] Trial counsel was not ineffective for failing to seek suppression of these statements considering their cumulative, helpful effect on both Mr. Peters' defense and the jury's understanding of the issues.

### 3. TRIAL COUNSEL MADE A STRATEGIC DECISION NOT TO MOVE TO SUPPRESS THE INTERROGATION AND THIS DECISION WAS PROFESSIONALLY REASONABLE UNDER THE *STRICKLAND* STANDARD.

Trial counsel did not move to suppress the police station interrogation because he did not believe any such application had sufficient merit.[147] But more importantly, he recognized the information gleaned from the interrogation was both harmful and helpful to Mr. Peters.[148] Trial counsel saw a potential *Miranda* issue,[149] weighed the positives and negatives of seeking suppression of the interrogation and decided to not seek suppression.[150] It is the type of decision—one reached after a

---

[146] *Id.* at A569 ("I'm just not satisfied that this ought to be precluded under 801(d)(2). It's some kind of utterance by the defendant and clearly is at least relevant under 401 and 402.").

[147] Affidavit of John Kirk, Esq. ("Kirk Aff.") ¶ 1, July 31, 2020 (D.I. 74). *See McAllister v. State*, 2010 WL 3398949, at *2 (Del. Aug. 30, 2010) ("Because the substantive claim made by [Defendant] is meritless, his attorney cannot be faulted for not having asserted it during the suppression proceedings."); *see also, United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999) ("There can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument." (citations omitted)).

[148] Kirk Aff. ¶ 1.

[149] After Detectives read Mr. Peters his *Miranda* rights and he initially and unequivocally consented to being questioned, Mr. Peters did later ask for a lawyer. When that occurred, the detectives asked if they could ask a few more questions and Mr. Peters consented. Def.'s App. at A26, A40.

[150] *See* Kirk Aff. ¶ 1.

"thorough investigation of law and facts"—that is always strongly presumed reasonable.[151]

"[A] lawyer's performance is constitutionally deficient only if no competent attorney would have chosen the challenged course of action."[152]  It is not the role of the Court to determine "what the best lawyers would have done . . . [or] even what most good lawyers would have done."[153]  Instead, the Court must determine whether trial "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment."[154]  As this Court has observed before, not moving to suppress an interrogation in light of a potential *Miranda* violation can be a shrewd strategic decision[155]—particularly where the defendant can make use of his statement in his own defense.

In *State v. Benson*, this Court considered a similar postconviction motion.[156] Deeming such a decision to forgo a suppression attempt sound strategy, the Court observed:

> First, Petitioner's statement could have been used at trial as a defense
> to some of Petitioner's charges, so seeking suppression of the statement
> would have been unwise.  Second, the 'he said, she said' nature of the

---

[151] *Hoskins*, 102 A.3d at 730 (quotation marks and citations omitted).

[152] *Green v. State*, 238 A.3d 160, 178 (Del. 2020) (citing *Premo v. Moore*, 562 U.S. 115, 124 (2011)).

[153] *Id.* (alteration in original) (quoting *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992)).

[154] *Hoskins*, 102 A.3d at 730 (quoting *Strickland*, 466 U.S. at 687).

[155] *State v. Benson*, 2009 WL 406795, at *6 (Del. Super. Ct. Jan. 29, 2009).

[156] *Id.*

case made it very likely that Petitioner would be required to testify in his own defense, and any testimony inconsistent with his statement to the police would have made that statement admissible for impeachment regardless of any *Miranda* violation.[157]

Mr. Peters' trial counsel was aware of a possible *Miranda* claim.[158] But trial counsel choose against pursuing suppression because Mr. Peters' statements made immediately upon arrest supported his trial defense.[159] Indeed, admission of those statements, in counsel's view, would allow him to obtain a justification jury instruction without requiring Mr. Peters to testify.[160]

Mr. Peters—via new counsel—now posits that not moving to suppress the interrogation gave him "no real choice but to testify." Not so. The introduction of the interrogation gave him a real choice to *not* testify—the self-defense evidence had already been planted in the State's case.[161]

Determining whether trial counsel was wise to or misguided in selecting this strategy is not the Court's role. *Strickland* doesn't deem trial counsel ineffective for not pursuing the best or most successful strategy; instead, it requires trial's counsel

---

[157] *Id.* (citations omitted).

[158] Kirk Aff. ¶ 1.

[159] *Id.* (Trial counsel "did not believe [the *Miranda* claim] had merit.").

[160] State's Response to Defendant's Motion for Post-Conviction Relief ("State's Resp.") at 23 n.110, Oct. 30, 2020 (D.I. 75) ("The State concedes that the defendant would have received a justification jury instruction based on the post-arrest interview, even if he did not testify at trial.").

[161] Mot. for Postconviction Relief at 41; *see also* State's Resp. at 23 n.110.

be informed by a thorough investigation of law and facts.[162] After such an investigation, Mr. Peters' trial counsel calculated that because Mr. Peters wanted to assert a justification claim—indeed, he had plainly claimed self-defense in his very first words to the police—it made little sense to try to suppress those words.[163]

Mr. Peters is not able to overcome the strong presumption of reasonableness afforded to trial counsel's actions, so he fails under the first *Strickland* prong.[164]

But even if Mr. Peters could demonstrate deficient attorney performance on his *Miranda* claim, he falls woefully short in demonstrating resultant prejudice. To succeed there, Mr. Peters must "demonstrate more than a mere 'conceivable' chance of a different result."[165] The "objective inquiry is not mathematically precise" but there can only be a finding of the required prejudice "when there is a substantial likelihood—*i.e.*, a meaningful chance—that a different outcome would have occurred but for counsel's deficient performance."[166]

Mr. Peters alleges that had the interrogation been suppressed, he would not have had to have argued self-defense and thus he would not have testified.[167] Since

---

[162] *See Burns v. State*, 76 A.3d 780, 788 (Del. 2013); *Hoskins*, 102 A.3d at 730 (citations omitted).

[163] Kirk Aff. ¶ 1; *see Benson*, 2009 WL 406795, at *6.

[164] *See Wright,* 671 A.2d at 1356; *Strickland,* 466 U.S. at 694.

[165] *Baynum v. State*, 211 A.3d 1075, 1084 (Del. 2019) (citing *Harrington v. Richter*, 562 U.S. 86, 112 (2011)).

[166] *Id.*

[167] Mot. for Postconviction Relief at 40-41 ("Mr. Peters' only viable defense was to argue self-defense. Given that strategy, Mr. Peters [had] no real choice but to testify.").

his trial testimony allowed the State to introduce his past convictions, Mr. Peters presently believes his decision to testify in his own defense harmed his case.[168] Mr. Peters' post-trial calculation that changing this decision would have led to his acquittal of all charges—recall, he was convicted only of the lesser felony assault—is, at best, speculative. His suggestion that such a decision would have undoubtedly led to acquittal ignores that choosing one course of trial action often precludes other possibilities.

In Mr. Peters' hypothetical scenario, without any of his self-incriminatory pre-trial words, he could choose a different defense in lieu of self-defense.[169] Maybe so, but even taking those other paths could lead to the interrogation's introduction should, for instance, Mr. Peters offer inconsistent trial testimony.[170] And the State's case certainly didn't rest on Mr. Peters' interrogation and testimony alone.[171] In its case-in-chief, the State presented: an eyewitness, witnesses to testify to Mr. Peters' hand injury when he was arrested, clothes found in Mr. Peters' room matching those

---

[168] *Id.*

[169] *See* Status Conf. Tr. at 8-9, June 22, 2022 (D.I. 91) (status conference held April 16, 2021).

[170] *Harris v. New York*, 401 U.S. 222, 226 (1971) ("The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances."); *see Michigan v. Harvey*, 494 U.S. 344, 353-54 (1990) (extending *Harris* to custodial statements after defendant asserts Sixth Amendment right to counsel); *see also Kansas v. Ventris*, 556 U.S. 586, 594 (2009) (holding prior inconsistent statement made in violation of Sixth Amendment right to counsel was admissible to challenge defendant's inconsistent testimony at trial).

[171] *See* Def.'s App. at A210.

worn during the attack, the knife found at Mr. Chapman's residence, the crime scene evidence, and Mr. Peters' statements to the police outside of the interrogation.[172]

Assuming the interrogation could have been successfully suppressed, Mr. Peters would have likely needed to testify in order to obtain a justification jury instruction; if he did not, and the interrogation was never heard, the jury likely would not have been given a self-defense instruction.[173] Against the weight of eyewitness testimony and the other evidence, there is a far better chance that the trial outcome would have been far worse for Mr. Peters.[174] Put simply, Mr. Peters has not shown there is a "meaningful chance" his suppression and trial strategy would have changed the outcome of his trial.[175] And, as Mr. Peters can satisfy neither the first *Strickland* prong (counsel deficiency) nor the second *Strickland* prong (prejudice), this claim fails.

## B. CLAIM II – THE CROSS-EXAMINATION OF THEODORE CHAPMAN

Mr. Peters alleges that his trial counsel failed to effectively cross-examine Mr. Chapman in light of his inconsistent statements between his interview and trial

---

[172] *Id.* at A192-A193, A338, A400-A402, A449, A469-A470, A477.

[173] *See Gutierrez v. State*, 842 A.2d 650, 652 (Del. 2004) ("We hold that the evidence presented by a defendant seeking a self-defense instruction is 'credible' for purposes of Title 11, Section 303(a) if the defendant's rendition of events, *if taken as true*, would entitle him to the instruction." (emphasis in original)). For Mr. Peters to provide some coherent rendition of the events, absent the interrogation, he needed to testify. *See* Def.'s App. at A940, A1080.

[174] Mr. Peters was charged with attempted murder first degree. *See* D.I. 3 (Indictment). The jury convicted him of the lesser offense of first-degree assault. Def.'s App. at A1156.

[175] *Baynum,* 211 A.3d at 1084.

testimony.[176]

While trial counsel may not have conducted his cross-examination with the same adroitness his postconviction counsel proclaims he could have, trial counsel nonetheless brought to light a number of inconsistencies in Mr. Chapman's testimony.[177] Due to difficulties in re-calling Mr. Chapman as a witness, trial counsel made the decision to present his investigator, Mr. Scott, who had interviewed Mr. Chapman.[178] With Mr. Chapman unavailable to respond, trial counsel then presented the "numerous inconsistencies" in Mr. Chapman's testimony.[179] For instance, trial counsel was able to elicit from his own investigator—and without Mr. Chapman's contest or contradiction—testimony that Mr. Chapman had previously reported: that he (Mr. Chapman) did not owe money to Mr. Peters; that he (Mr. Chapman) did not give a knife to Mr. Peters; and that he (Mr. Chapman) did not hear yelling at the time of the stabbing.[180]

Remember, under the settled standards for such claims, Mr. Peters must establish not only that his trial attorney's representation fell below an objective standard of reasonableness, but that actual deficiencies in the attorney's

---

[176] Mot. for Postconviction Relief at 43-45.

[177] Kirk Aff. ¶¶ 4-5.

[178] *See id.* ¶¶ 3-5.

[179] *Id.* ¶¶ 4-5.

[180] Def.'s App. at A659-A660.

representation caused him substantial prejudice.[181] The prejudice required is defined as a reasonable probability that but for counsel's errors, the result of his trial would have been different.[182] And "[t]he likelihood of [that] different result must be substantial, not just conceivable."[183]

Concerning the first necessary showing (deficient performance), review of Mr. Chapman's cross-examination evidences trial counsel's numerous attempts to impeach him.[184] But Mr. Peters' characterization of his trial attorney's advocacy as some abject "failure to impeach [Mr.] Chapman," is belied by the record.[185] Trial counsel's alleged failure to ask every question that postconviction counsel now says he would have asked does nothing to diminish trial counsel's objectively reasonable

---

[181] *Ploof*, 75 A.3d at 820-21.

[182] *Id.*; *Strickland*, 466 U.S. at 693-94.

[183] *Starling v. State*, 130 A.3d 316, 325 (Del. 2015) (quoting *Harrington*, 562 U.S. at 112); *see Strickland*, 466 U.S. at 693 ("It is not enough for the [postconviction movant] to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." (citation omitted)).

[184] Def.'s App. at A227 (Cross-Examination of Mr. Chapman):

Trial Counsel: Okay. You also testified just now that when you went outside you saw on the second stab -- the second, I guess, instance of stabbing, you saw Mr. Peters stab Mr. Edwards in the chest; is that right?

Mr. Chapman: Yes.

Trial Counsel: Okay. Would it surprise you to know that Mr. Edwards never sustained any wound to his chest?

Mr. Chapman: Like I said, he poked him.

[185] Mot. for Postconviction Relief at 48-49.

and effective performance.

Mr. Peters' claim that if only trial counsel had asked the right questions—and presumably gotten the right answers with no real resistance or explanation—wholesale acquittal would have occurred also falls far short.[186]  According to Mr. Peters, trial counsel's cross-examination of Mr. Chapman, or purported lack thereof, caused prejudice as the "case hinged on Chapman's credibility."[187]  But other than a bald characterization of the State's case as weak, Mr. Peters has done little to provide specific evidence of how the trial result—a lesser-offense verdict—would have changed given some more extensive cross-examination.[188]

Like most criminal trials, his did not hinge on any one particular piece of evidence.[189]  Thus, Mr. Peters' mere postulation that the outcome of his trial would have been different with his imagined perfect cross-examination of Mr. Chapman fails to meet the "meaningful chance" requirement necessary under *Strickland*.[190]

---

[186]  *Id.* at 47-48.

[187]  *Id.* at 49.

[188]  *See Hamby*, 2005 WL 914462, at *3 ("Without specific evidence that the additional cross-examination would have changed the outcome of the trial, [defendant] is unable to meet his burden under *Strickland*." (citations omitted)).

[189]  Def.'s App. at A192-A193, A338, A400-A402, A449, A469-A470, A477.

[190]  *Baynum,* 211 A.3d at 1084.

## C. CLAIM III – THE HABITUAL CRIMINAL SENTENCING MOTION

Mr. Peters complains that his counsel should have challenged the State's habitual criminal sentencing motion and predicts had he done so, that motion would have failed.

### 1. MR. PETERS' PRIORS AND THE STATE'S PETITION

Before Mr. Peters attacked Derrick Edwards and was convicted of the instant crimes—first-degree assault, PDWDCF, PDWPP, and evidence tampering—he had already been convicted of three prior felonies. One of those priors, assault in a detention facility, was classified as a violent felony.[191] And so, before his sentencing in this matter, the State moved to have Mr. Peters declared a habitual criminal under 11 *Del. C.* § 4214(c) and sentenced consistent therewith.[192] The State's habitual criminal petition set forth Mr. Peters' three prior convictions:

- Burglary in the Third Degree.
  Offense Date: July 25, 2014.
  Conviction and Sentencing Date: September 9, 2014.

- Escape After Conviction.
  Offense Date: November 22, 2014.
  Conviction and Sentencing Date: January 6, 2015.

- Assault in a Detention Facility.
  Offense Date: February 5, 2015.
  Conviction and Sentencing Date: March 10, 2016.[193]

---

[191] Def.'s App. at A1214. *See* DEL. CODE ANN. tit. 11, § 4201(c) (2017) (classifying assault in a detention facility as a violent felony).

[192] Def.'s App. at A1212-A1215 (State's Habitual Offender Motion).

[193] *Id.*

Under 11 *Del. C.* § 4214(c), a person who has been convicted of a fourth or subsequent felony may be declared a habitual criminal.[194]  When interpreting § 4214, our Supreme Court has been unequivocal that, when a procedurally adequate petition demonstrating the existence of the requisite number of prior felony convictions is filed—this Court's declaration of habitual criminal status is *not* discretionary.[195]  Indeed, "where the State initiates the habitual offender process, the court is limited to granting only the result sought by the State."[196]

Mr. Peters' trial counsel received notice of the State's petition and determined he had no good faith basis to challenge it in court.[197]  And having found that Mr. Peters had been convicted of three separate, successive, felonies (one of which was a violent felony), the Court was constrained to declare Mr. Peters a habitual criminal upon the State's application and apply § 4214(c) as petitioned.[198]  So the Court imposed the required 50-year sentence of imprisonment comprised of two

---

[194]  DEL. CODE ANN. tit. 11, § 4214(c) (2017).

[195]  *See Reeder v. State*, 2001 WL 355732, at *3 (Del. Mar. 26, 2001) ("We disagree that habitual offender status is discretionary under § 4214."); *Brown v. State*, 2020 WL 609646, at *2 (Del. Feb. 7, 2020).

[196]  *Reeder*, 2001 WL 355732, at *3 (quoting *Kirby v. State*, 1998 WL 184492, at *2 (Del. Apr. 13, 1998)); *id.* ("Simply put, the General Assembly, in enacting § 4214, limited the Superior Court's sentencing discretion once the State properly initiates the habitual offender status process.").

[197]  Def.'s App. at A1221; Kirk Aff. ¶ 8.

[198]  *Reeder*, 2001 WL 355732, at *3; *Kirby*, 1998 WL 184492, at *2.

separate minimum-mandatory terms.[199]

## 2. MR. PETERS' CURRENT CHALLENGE TO HIS § 4214 SENTENCE.

Mr. Peters does not dispute: (1) that he was convicted of three prior felonies; (2) that there was some gap in time between the sentencing and commission of each of those three felonies; (3) that one of those prior felonies was statutorily classified as a violent felony; or, (4) that it had been some three years since sentencing for the last of those priors and the present assault and weapons convictions.[200] Nor has Mr. Peters ever suggested that there was any procedural or technical defect in the State's motion or in his habitual criminal status hearing. His argument now is that sentencing counsel was constitutionally ineffective for failing to argue that Mr. Peters might not qualify for sentencing as a habitual criminal because he had not had "some chance for rehabilitation" between his prior convictions.[201]

Again, under the well-worn *Strickland* standard, Mr. Peters carries the burden of establishing (a) that his sentencing attorney's representation fell below an objective standard of reasonableness, and (b) that actual deficiencies in the attorney's representation caused him substantial prejudice.[202] The necessary

---

[199] Def.'s App. at A1227, A1229-A1235.

[200] Mot. for Postconviction Relief at 58, 61-64.

[201] *Id.* at 61-64.

[202] *See Green*, 238 A.3d at 174 (citing *Strickland,* 466 U.S. at 687-88); *see also Harden v. State*, 180 A.3d 1037, 1045 (Del. 2018) (applying the *Strickland* standard to an ineffectiveness-at-sentencing claim).

prejudice must be a reasonable probability that but for counsel's errors, the result of his habitual criminal status and sentencing proceeding would have been different.[203] And the likelihood of that different result must be substantial not just conceivable.[204]

### 3. DELAWARE'S HABITUAL CRIMINAL ACT AND "SOME CHANCE FOR REHABILITATION."

To get to the nub of Mr. Peters' specific challenge, one must delve a bit into our courts' history of interpreting the Habitual Criminal Act. More particularly, one must understand from where the phrase "some chance for rehabilitation" came and what it has come to mean.

Four decades ago, in *Hall v. State*, the Delaware Supreme Court sought to provide a definitive interpretation of the Delaware habitual criminal statute's predicate-felony requirement.[205] The Court noted that § 4214 "does not address itself to the question [posed there] of whether a single proceeding involving convictions of two felonies results in a '2 times convicted' status for the offender."[206] To resolve this ambiguity, the Court adopted this reading: to be counted in the three-strikes habitual criminal equation, a subsequent conviction must have been "on

---

[203] *Harden*, 180 A.3d at 1045. *See also United States v. Otero*, 502 F.3d 331, 337 (3d Cir. 2007) (finding prejudice prong satisfied "when a deficiency by counsel resulted in a specific, demonstrable enhancement in sentencing . . . which would not have occurred but for counsel's error." (quoting *United States v. Franks*, 230 F.3d 811, 815 (5th Cir. 2000)).

[204] *Green*, 238 A.3d at 174 (citation omitted).

[205] 473 A.2d 352, 356 (Del. 1984).

[206] *Id.*

account of an offense which occurred after sentencing had been imposed for the [prior] offense."[207]

Within months, the Supreme Court addressed the same issue with Delaware's four-strike habitual status provision in *Buckingham v. State*.[208] And there the Court required three separate prior felony convictions "each successive to the other, with some chance for rehabilitation after each sentencing" before the person could be declared a habitual criminal under that provision.[209]

In short, *Hall* and *Buckingham* made clear that there must be crime-conviction-sentence, crime-conviction-sentence sequencing, with no overlap, for each given felony that is included in the habitual criminal status calculation. And the Court described that necessary temporal gap as "some *chance* for rehabilitation after each sentencing."[210]

Since then, much has been said of that rather simple phrase.[211] And attempts

---

[207] *Id.* at 356-57.

[208] 482 A.2d 327 (Del. 1984).

[209] *Id.* at 330-31.

[210] *Id.* (emphasis added); *Hall*, 473 A.2d at 357 (suggesting there should be "chances to reform following prior convictions").

[211] On occasion, it is worded an "opportunity to reform" or "opportunity for rehabilitation" which still "simply requires a 'specified number of separate encounters with the criminal justice system and a corresponding number of chances to reform.'" *Payne v. State*, 1994 WL 91244, *1 (Del. Mar. 9, 1994) (quoting *Buckingham*, 482 A.2d at 330). *See also Ross v. State*, 990 A.2d 424, 430 (Del. 2010) (a non-§ 4214 case that describes the Court's concern in *Hall* and *Buckingham* that if it did not require its therein-adopted sequencing of priors one could be subject to a life sentence as a habitual criminal offender "without having distinct opportunities to reform").

have been made—always in vain—to expand its meaning.  Yet, our courts have, without fail, understood "some chance for rehabilitation" to mean just one thing—only that "some period of time must have elapsed between sentencing on the earlier conviction and the commission of the offense resulting in the later felony conviction."[212]  Indeed, each attempt to engraft any requirement greater than the mere passing of a moment from the recess of one felony sentencing to an offender's decision to commit his next felony has been rejected.[213]  In doing so, the § 4214 cases have explicated what "some chance for rehabilitation" is *not*: (i) incarceration for prior convictions;[214] (ii) release from prison between convictions;[215] (iii) participation in a treatment program as a result of or between prior convictions;[216] or (iv) that the habitual criminal candidate committed the predicate offenses only

---

[212] *Johnson v. Butler*, 1995 WL 48368, at *1 (Del. Jan. 30, 1995) (citation omitted); *Eaddy v. State*, 1996 WL 313499, at *2 (Del. May 30, 1996) (citation omitted); *Mayo v. State*, 2016 WL 2585885, *2 (Del. Apr. 21, 2016) (citation omitted); *State v. Hicks*, 2010 WL 3398470, at *4 (Del. Super. Ct. Aug. 17, 2010) (collecting cases) ("There is no set time frame between the preceding conviction and the arrest; **some** period of time is all that is required.") (emphasis in original), *aff'd* 2011 WL 240236 (Del. Jan. 19, 2011).  *Cf. State v. Yarborough*, 2019 WL 4954959, at *2 (Del. Super. Ct. Oct. 2, 2019) (Commissioner's report and recommendation for postconviction relief denial recounting the sentencing judge's suggestion that the Court might have had discretion to consider timing and nature of predicate felonies when determining whether "under the present circumstances, Defendant had an adequate opportunity for rehabilitation.").

[213] *E.g.*, *Eaddy*, 1996 WL 313499, at *1-2 (affirming habitual criminal offender status where the defendant "[w]ithin a matter of hours after his [last felony] sentencing, . . . was arrested on the charges that led to his present convictions and life sentence").

[214] *Wehde v. State*, 983 A.2d 82, 85-86 (Del. 2009).

[215] *Payne*, 1994 WL 91244, *1.

[216] *Eaddy*, 1996 WL 313499, at *2; *Walker v. State*, 2011 WL 3904991, at *2 (Del. Sept. 6, 2011).

after he or she  reached the age of majority.[217]

In the face of all this, Mr. Peters seizes on one short passage from one unsuccessful habitual criminal status challenge where the Supreme Court observed "our cases do not articulate a bright line, one size fits all, standard for determining whether any particular defendant had sufficient time to rehabilitate" and went on to "assume, *without deciding*, that our case law establishes that there must be some time span for rehabilitation before a conviction can constitute a predicate offense" and then suggested the movant's intervening one-year term of probation would "satisfy any rational minimum standard."[218]  Mr. Peters insists that his predicate convictions do not satisfy any conceivable rational minimum standard.

### 4. SOME CLARITY ON JUST WHAT THE SOME "CHANCE" OR "OPPORTUNITY" FOR REHABILITATION OR REFORM REALLY MEANS.

Recall, at its core, this matter is one of statutory interpretation.  And as Mr. Peters concedes, the "some chance for rehabilitation" language is wholly absent from the habitual criminal statute—it's really a judicially-created add-on.[219]  That is why each attempt to require *anything* more than just the tick of the clock between the recess of one's felony sentencing and his next felonious act has failed.[220]

---

[217]  *Vickers v. State*, 117 A.3d 516, 520 (Del. 2015).

[218]  Mot. for Postconviction Relief at 59 (citing *Wehde*, 983 A.2d at 86) (emphasis added).

[219]  Postconviction Hr'g Tr. at 9-10, May 25, 2022 (D.I. 92) (hearing held Oct. 14, 2021).

[220]  *See* Section IV.C.3 *supra*.

To be sure there have been some penned and verbal forays by courts speaking on the *Buckingham* phrase that could be read to intimate there may be something more.[221] To be sure, one might rightly suggest these have introduced some degree of uncertainty as to what is actually meant by a habitual criminal candidate's prior "chance" or "opportunity" after each earlier conviction.[222] And, too, when such lack of clarity is noticed, a court might be called on to course-correct.[223] So, as it appears this Court is the most recent contributor to this murkiness, it is only fitting that this Court should state the rule plainly: "Some *chance* for rehabilitation after each sentencing" means only that there must be crime-conviction-sentence, crime-conviction-sentence sequencing, with no overlap, for each given felony that is included in the habitual criminal status calculation. And there need be no more than the passing of a moment between the fall of the gavel recessing a prior's sentencing hearing and the person's commission of his next felony to insure there is no overlap.

Why this exacting rule?

---

[221] *E.g.*, *Wehde*, 983 A.2d at 86; *Sammons v. State*, 68 A.3d 192, 196 (Del. 2013); *Yarborough*, 2019 WL 4954959, at *2.

[222] Def.'s Second Suppl. Mem. at 3, Oct. 26, 2021 (D.I. 88).

[223] *See, e.g.*, *Lecates v. State*, 987 A.2d 413, 418-19 (Del. 2009) ("[r]ecognizing that our pertinent case law is not entirely clear" on the proper test for constructive possession of a firearm in certain contexts, and "clarify[ing] several points" and "existing inconsistencies" in relevant Delaware law); *Reed v. State*, 258 A.3d 807, 828-29 (Del. 2021) ("We acknowledge that our decisional law on this point has not been consistent. In order to remedy this problem, we now hold that a criminal defendant's control of the objectives of the representation prior to sentencing requires that counsel either obey an instruction to file a motion to withdraw a guilty plea, or seek leave to withdraw so that the defendant can file the motion with other counsel or *pro se*.").

Well, "this Court's role is to interpret the statutory language that the General Assembly actually adopt[ed], even if unclear and explain what [the Court] ascertain[s] to be the legislative intent without rewriting the statute to fit a particular policy position."[224] When a questioned statute read as a whole is unambiguous, the Court must hew as closely to that language as possible by applying the plain, literal meaning of its words—without embellishment.[225] What's more, the *Buckingham* addition is always expressed as requiring just a "chance" or "opportunity." From the moment one has the last word of an imposed felony sentence pronounced to her by her sentencing judge, she has the chance or opportunity to pursue rehabilitation. Whether she squanders that chance or opportunity by committing a subsequent felony a few moments or a few years after that proceeding is of no moment for habitual criminal sentencing.

To say otherwise would encourage Mr. Peters' pell-mell approach to habitual criminal sentencings. Under his rule, the sentencing court would evaluate the

---

[224] *Taylor v. Diamond State Port Corp.*, 14 A.3d 536, 542 (Del. 2011) (citation omitted); *Pub. Serv. Comm'n of State of Del. v. Wilm. Suburban Water Corp.*, 467 A.2d 446, 451 (Del. 1983) ("Judges must take the law as they find it, and their personal predilections as to what the law should be have no place in efforts to override the properly stated legislative will."); *State v. Murray*, 158 A.3d 476, 481-82 (Del. Super. Ct. 2017) (citation omitted).

[225] *Arnold v. State*, 49 A.3d 1180, 1183 (Del. 2012) (citing *Dennis v. State*, 41 A.3d 391, 393 (Del. 2012)); *Friends of H. Fletcher Brown Mansion v. City of Wilm.*, 34 A.3d 1055, 1059 (Del. 2011) ("[T]he meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain . . . the sole function of the courts is to enforce it according to its terms." (alteration in original) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917))); *Ross*, 990 A.2d at 428 (citation omitted).

surrounding circumstances of each predicate conviction and determine whether and which of the prior conviction(s) should "go away" based on some ill-defined idea of what one's rehabilitative chance or opportunity should entail.[226]

Such a reading presents rather perverse incentives to one considering his next felony—Do it immediately! Do it when young! Do it in prison! Such clustering of one's felony conduct and convictions so that they might not count when determining habitual criminality is undoubtedly at odds with both legislative intent and what our courts mean by some *chance* or *opportunity* for rehabilitation. That, of course, would counter the Court's mandate to eschew statutory interpretations that foster mischievous or absurd results that could not have been intended.[227] At bottom, adopting Mr. Peters' approach would require the Court to travel that much further

---

[226] The Court: So do all three of them count as one? Do I count the first and third because there is some reasonable period of time in between. The Court has to have some rule or some set of guidelines for this. And you're saying, well, it's basically whatever the particular judge thinks as far as the time and other factors.

PCR Counsel: You know, I am kind of saying that, Your Honor. . . . But if Your Honor is asking me specifically which conviction goes away, I would suggest escape after conviction. That's clearly a person who's not rehabilitated, but yet continues to commit another felony. And then he's still not rehabilitated because he's still in there hitting people in the detention facility.

Postconviction Hr'g Tr. at 11-12.

[227] *See One-Pie Invs., LLC v. Jackson*, 43 A.3d 911, 914 (Del. 2012) ("When construing a statute, literal or perceived interpretations which yield mischievous or absurd results are to be avoided.") (cleaned up); *Spielberg v. State*, 558 A.2d 291, 293 (Del. 1989) (citation omitted).

from the plain words of Delaware's habitual criminal statute. And this the Court will not do.

### 5. Mr. Peters' Counsel Was Not Ineffective When He Chose a Different Course Than The Now-proposed Novel (But Ultimately Futile) Attack on His Client's § 4214 Eligibility.

Mr. Peters alleges here that his sentencing counsel was ineffective for failing to challenge the State's motion by saying that his collective prior convictions couldn't be used because there was an inadequate "chance" or "opportunity" for rehabilitation between each conviction.[228] Mr. Peters admits that he cannot identify one Delaware case in which this Court denied a habitual criminal petition because of a supposed inadequate separation between a prior sentencing and the commission of a subsequent crime.[229] Nonetheless, in his view, "[g]iven the factual circumstances of the closeness in time of the three predicate offenses, his age at the time, and the extensive time at Level 4 and Level 5 between the offenses, Mr. Peters

---

[228] Mot. for Postconviction Relief at 61-64.

[229] Says Mr. Peters postconviction counsel, "I'm not aware of any, nor is it likely such a ruling would be found in case law." Def.'s Second Suppl. Mem. at 1. He goes on to posit that this is because "[t]he motion would be denied on the record and then not appealed by the State." *Id.* Not likely, given the history of this issue, the volume of case law on it, and the fact that the State is hardly shy about appealing what it believes to be illegal sentences—habitual or other. *See, e.g.*, *Reeder*, 2001 WL 355732, at *3 (describing State's successful motion to correct sentence after Court's misapplication of habitual criminal statute); *State v. Petty*, 2012 WL 3114759, at *1 (Del. July 31, 2012) (State's successful appeal of this Court's failure to apply defendant's habitual criminal status to his first-degree robbery conviction); *State v. Lennon*, 2003 WL 1342983, at *1 (Del. Mar. 11, 2003) (State's successful appeal of this Court's failure to apply minimum-mandatory sentence). The far more plausible reason is that this Court never has denied a habitual motion for lack of an adequate "chance" or "opportunity" for rehabilitation because of that criterion's straightforward limited meaning.

did not have the requisite 'some chance for rehabilitation' or 'distinct opportunities for reform' that is required before an adult can be declared a habitual offender."[230] In other words, he says, if there never was one before, this is ***the*** case where this Court should have found three separate and properly-sequenced prior felony convictions wasn't enough.[231]

Again, Mr. Peters must prove that (1) his sentencing counsel's performance was objectively unreasonable and (2) he was prejudiced as a result.[232]

As to the first element, "the defendant must show 'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment.'"[233] And when examining counsel's performance, "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."[234]

More to the point here, Mr. Peters' counsel cannot be deemed ineffective for failing to raise novel or explicitly unanswered questions with no real precedential

---

[230] Mot. for Postconviction Relief, at 67.

[231] *E.g.*, Postconviction Hr'g Tr. at 10 (Mr. Peters' own description of the peculiarity of his situation and argument: "I don't think . . . that this narrowest of windows to defeat an habitual motion exists very frequently. It's probably rare as the proverbial hen's teeth."); *id.* at 11-12 (speaking to the rarity of this situation and argument); *id.* at 17.

[232] *Strickland*, 466 U.S. at 687-88, 691-92; *Harden*, 180 A.3d at 1045.

[233] *Hoskins v. State*, 102 A.3d at 730 (quoting *Strickland*, 466 U.S. at 687).

[234] *Strickland*, 466 U.S. at 690.

guidance.[235] Indeed, "it is well-established that counsel has no duty to anticipate changes in the law. Nor does counsel have a duty to foresee new developments in the law which lie in the future."[236] Further, counsel cannot be "ineffective for failing to make futile arguments."[237]

Mr. Peters' trial counsel could reasonably determine any courtroom challenge, as now-proposed, would be unsuccessful, if not futile, when similar arguments have been raised over the last four decades and not one court has subscribed to the argument that a defendant was not accorded "some chance for rehabilitation" when his predicate convictions did not overlap.

That said, Mr. Peters' trial counsel explained that he was hardly complacent in his pre-hearing efforts to spare his client from habitual criminal sentencing. After the filing of the State's motion, trial counsel contacted the Department of Justice's State Prosecutor to request reconsideration. It wasn't granted.[238] Indisputably, trial counsel was aware of the effect of the habitual motion, the potential defenses thereto, and sought alternatives he thought could be more successful.[239]

In evaluating an attorney's performance, a reviewing court should "'eliminate

---

[235] *Lewis v. State*, 2022 WL 175771, at *4 (Del. Jan. 20, 2022).

[236] *Id.*

[237] *State v. Prince*, 2022 WL 211704, at *7 (Del. Super. Ct. Jan. 24, 2022) (citing cases).

[238] Kirk Aff. ¶ 9.

[239] *See id.* ¶¶ 8-9.

the distorting effects of hindsight,' 'reconstruct the circumstances of counsel's challenged conduct,' and 'evaluate the conduct from counsel's perspective at the time.'"[240] "If an attorney makes a strategic choice 'after thorough investigation of law and facts relevant to plausible options,' that decision is 'virtually unchallengeable.'"[241] Just so here.

Trial counsel's decision not to oppose the motion was not objectively unreasonable. There was nothing factually for defense counsel to oppose. And the adverse caselaw was overwhelming. "There can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument."[242]

In turn, Mr. Peters fails to prove his trial counsel's performance in the habitual criminal litigation and sentencing proceeding was objectively unreasonable. He, therefore, cannot satisfy the first prong of *Strickland*. And failure to make one or the other showing under the *Strickland* test "will render the claim unsuccessful."[243]

Even still, Mr. Peters' sentencing claim also fails to meet the burden under the second *Strickland* prong. The necessary prejudice here must be a reasonable probability that but for counsel's errors, the result of his habitual criminal status and

---

[240] *State v. Flowers*, 150 A.3d 276, 282 (Del. 2016) (quoting *Strickland*, 466 U.S. at 689).

[241] *Hoskins*, 102 A.3d at 730 (quoting *Ploof*, 75 A.3d at 852).

[242] *Sanders*, 165 F.3d at 253.

[243] *Hamby*, 2005 WL 914462, at *2 (citation omitted).

sentencing proceeding would have been different.[244]  To carry his prejudice burden in these circumstances Mr. Peters must prove counsel's *Strickland*-level deficient performance resulted in the application of a specific, demonstrable sentencing enhancement that would not have occurred but for counsel's error.[245]  For all the reasons explained above Mr. Peters cannot and has not done so here.  And this separate failure also dooms his sentencing claim.[246]

Put simply, on his sentencing claim Mr. Peters establishes neither that trial counsel's performance was deficient because it fell below an objective standard of reasonableness, nor that he was prejudiced by trial counsel's performance. Accordingly, his insistence that his sentence must be vacated because he is not eligible to be declared a habitual criminal and that he is due resentencing without § 4214(c) enhancement is without merit.

## D. CLAIM IV – THE CUMULATIVE PREJUDICE CLAIM.

Lastly, Mr. Peters contends that "[t]he cumulative nature of the prejudice in this case requires postconviction relief."[247]  He posits that the cumulative effect of his counsel's supposed errors denied him a fair trial.  But, this cumulative prejudice

---

[244] *Harden*, 180 A.3d at 1045.

[245] *See Otero*, 502 F.3d at 337.

[246] *Ploof*, 75 A.3d at 825 ("*Strickland* is a two-pronged test, and there is no need to examine whether an attorney performed deficiently if the deficiency did not prejudice the defendant." (citing *Strickland*, 466 U.S. at 697)).

[247] Mot. for Postconviction Relief at 72.

argument gains no more traction than the others did severally. More directly, because Mr. Peters has failed on each count to prove that his trial counsel was deficient and that, but for trial counsel's performance, the outcome of his trial or sentencing would have been different, he fails in the aggregate.

The Delaware Supreme Court addressed a similar cumulative effect argument in *Hoskins v. State*.[248] The Supreme Court utilized a plain error standard of review and looked for "material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[249] Under this analysis, the Court noted that "none of [the postconviction movant's] individual claims of ineffective assistance have merit because of a failure to show prejudice," and, consequently, found the movant's "claim of cumulative error [to be] without merit."[250] Same here.

Mr. Peters fails to establish prejudice under each of his individual trial and sentencing performance claims. Therefore, he has not established any due process violation based on purported cumulative error that would warrant a grant of postconviction relief.

---

[248] 102 A.3d 724, 735 (Del. 2014).

[249] *Id.* (citation omitted).

[250] *Id.*

# V. CONCLUSION

Mr. Peters has proved neither the deficient performance by counsel nor the prejudice required for relief under *Strickland*.  In turn, his three remaining claims—those challenging the lack of a suppression motion, alleged deficient cross-examination, and failure to contest the habitual criminal motion at sentencing—gain him no postconviction relief here.  And as each of those individual substantive claims have failed, the cumulative claim fails also.

Mr. Peters' Motion for Postconviction Relief is **DENIED**.

**IT IS SO ORDERED.**

 

Paul R. Wallace, Judge

Original to Prothonotary