Anel HUBBARD, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 279, 2010.

Supreme Court of Delaware.

Submitted: Feb. 17, 2011.
Decided: April 12, 2011.

Patrick J. Collins, Esquire, Aaronson, Collins & Jennings, LLC, Wilmington, Delaware, for appellant.

Paul R. Wallace, Esquire, and Elizabeth A. Powers, Esquire, Department of Justice, Wilmington, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND and BERGER, Justices.

HOLLAND, Justice:

The defendant-appellant, Anel Hubbard ("Hubbard"), was arrested by City of Wilmington police officers in connection with a shooting that occurred on West 5th Street. Hubbard was subsequently indicted by a grand jury for the following offenses: one count of Attempted Murder in the First Degree,[1] two counts of Robbery in the

---

1. Del.Code Ann. tit. 11, § 531.

First Degree,[2] one count of Carjacking in the First Degree,[3] one count of Conspiracy in the Second Degree,[4] one count of Reckless Endangering in the First Degree,[5] one count of Possession of a Deadly Weapon by a Person Prohibited,[6] and five counts of Possession of a Firearm During the Commission of a Felony.[7]

Following a six-day trial, the jury returned guilty verdicts on eleven of the indicted offenses. The remaining charge, Possession of a Deadly Weapon by a Person Prohibited, had been severed and heard simultaneously at a separate bench trial. After the jury returned its verdict, the trial judge found Hubbard guilty of that separate charge as well.

Prior to sentencing, the State filed a motion to declare Hubbard a habitual offender. The Superior Court granted the State's motion. Hubbard was sentenced to twelve life terms of incarceration without the possibility of any reduction in those sentences.

In this direct appeal, Hubbard argues that the Superior Court erred in denying his motion to suppress his custodial statement to a police detective because the waiver of his *Miranda*[8] rights was not knowing, intelligent, and voluntary. In support of that argument, Hubbard relies on three factual assertions: first, the detective's "rapid" recitation of Hubbard's *Miranda* rights; second, the detective's failure to "more affirmatively ascertain" whether Hubbard wanted to give a statement before proceeding with questioning; and third, the detective's failure to ascertain whether Hubbard was competent to

understand the rights he was waiving because of Hubbard's representation that he had been intoxicated the previous night. According to Hubbard, "these three factors did not allow him to fully comprehend the nature of his *Miranda* rights and the consequences of abandoning those rights."

The record reflects that Hubbard's arguments are without merit. Accordingly, the Superior Court properly denied the motion to suppress. Therefore, the judgments of the Superior Court must be affirmed.

### Facts

On June 25, 2009, at approximately 12:30 a.m., John Walker ("Walker"), and Waldemar Ortiz ("Ortiz") left the Ortiz residence located on 5th Street in Wilmington, Delaware, and walked toward the driveway where Walker's motorcycle was parked. As Walker was getting on his motorcycle and preparing to go home, two black males approached. One of the men ordered Walker to get off the motorcycle, while the other man pointed a handgun at both Walker and Ortiz. The gunman ordered them to lay face down on the ground.

The unarmed man was unable to start the motorcycle. Walker got up from the ground, explained how to start the motorcycle, and helped put it in gear. As the unarmed man began to drive away, the gunman started shooting at Ortiz and Walker. Walker was shot once in the jaw, twice in the thigh, and once on the calf. Ortiz ran away, uninjured, toward his house. The gunman then fled. Ortiz re-

---

2. Del.Code Ann. tit. 11, § 832.

3. Del.Code Ann. tit. 11, § 836.

4. Del.Code Ann. tit. 11, § 512.

5. Del.Code Ann. tit. 11, § 604.

6. Del.Code Ann. tit. 11, § 1448.

7. Del.Code Ann. tit. 11, § 1447.

8. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

turned and drove Walker to St. Francis Hospital.

When Wilmington Police arrived at the shooting scene, they observed surveillance cameras at the adjacent Latin American Community Center. The officers were able to view the surveillance videotape. It depicted Walker and Ortiz being approached by two black males, one appearing to have a gun in his hand. One of the men got onto the motorcycle while Walker was face down on the ground. The videotape does not show the shots actually being fired. It does show the armed man running away and Walker crawling toward the garage.

After viewing the surveillance videotape, Wilmington Police went to St. Francis Hospital. There, an officer interviewed Ortiz who gave a description of the perpetrators and the motorcycle. Following Ortiz's interview, the police observed the stolen motorcycle at a WaWa on North DuPont Highway in New Castle, Delaware. The black male sitting on the motorcycle, identified as Isaiah Taylor ("Taylor"), matched one of Ortiz's descriptions and was taken into custody.

Ortiz was interviewed later on the morning of June 25, 2009, by Detective Peter Leccia ("Detective Leccia") at the Wilmington Police Department. A photographic lineup was created and shown to Ortiz who positively identified Taylor as the man who rode away on the motorcycle. Ortiz was unable to identify the gunman from a photographic lineup.

A Wilmington police officer also attempted to interview Walker on June 25, 2009. While he was unable to speak due to his injuries, he positively identified Taylor from a photographic lineup as the individual who stole the motorcycle. Walker was not able to make an identification of the gunman.

Following his apprehension, Taylor was interviewed at the Wilmington Police Department by Detective Leccia. Taylor admitted that he and another man, later identified as Hubbard, stole the motorcycle from the victim. According to Taylor, Hubbard began firing shots at the victims as Taylor drove away.

Based on Taylor's statement, a search warrant was issued for the home where Hubbard was believed to reside. Hubbard was taken into custody as he was leaving the residence. A handgun was recovered from the ceiling tiles of the room in the residence that Hubbard occupied. The handgun was later examined by a forensic firearms examiner who was unable to conclusively establish that the five shell casings recovered from the scene were fired from the handgun. The forensic firearm examiner did, however, determine that a bullet found at the crime scene had been fired by the handgun.

Hubbard was brought to the Wilmington Police Department where he was interviewed by Detective Leccia at approximately 1:00 p.m. on the afternoon of June 25, 2009. Detective Leccia advised Hubbard of his *Miranda* rights. Hubbard stated that he understood those rights.

Instead of invoking his right to remain silent, Hubbard began to answer Detective Leccia's questions. Initially, Hubbard denied any involvement in the shooting and related a fictitious story about his whereabouts the previous night, also claiming to have been "drunk and high." As the interrogation progressed, however, Hubbard ultimately admitted his role in the shooting.

### Miranda *Warnings and Waiver*

The following are the relevant portions of Hubbard's statements to Detective Lec-

cia for purposes of our *Miranda* analysis: [9]

Hubbard: I was wondering when ya'll caught me with um with the dope I had got probation for that so I had violated probation that I just got out in October.

Detective: Yeap. Alright um I'm gonna talk to you about some, some stuff that happened last night. But before we go over everything I got advise you your rights. OK? You have the right to remain silent.

Hubbard: I'm under arrest?

Detective: Anything you say. I'm just advising your rights. Whenever I'm talking to you. I don't know what you're going to say.

Hubbard: Oh, see.

Detective: OK?

Hubbard: Oh I thought I was under arrest.

Detective: Well right right now you're just being detained right now okay. I got stuff that I have to get from you. But uh you have the right to remain silent. Anything you say can and will used against you in a court of law. You have the right to remain you have a right to have an attorney present during any and all uh questioning. If you can't afford an attorney the State will provide you one free of charge. At anytime during questioning you you have, you have the right to invoke that and then stop answering questions at anytime.

Hubbard: Uh huh.

Detective: **Do you understand the rights I've explained to you?**

Hubbard: **Yes sir.**

Detective: Okay with your rights in mind do you wanna talk to me?

Hubbard: Hum?

Detective: Do you wanna talk to me? It's about an incident that happened last night on uh . . .

Hubbard: Where at?

Detective: On uh it was on the uh Hilltop okay.

Hubbard: Hilltop?

Detective: OK? Something happened last night right after midnight.

Hubbard: Inaudible.

Detective: I gotta know if you wanna talk to me about what you were doing last night.

Hubbard: I don't care. I was with a girl.

Detective: **Be cool to talk, and so that's a yes, you'll talk to me?**

Hubbard: **Yeah. I was with I was with a girl. Yeah.**

Detective: Ok. What who were you with last night?

Hubbard: Lonyea Smith.

## Miranda's *Procedural Safeguards*

In *Miranda v. Arizona,* the United States Supreme Court recognized that all custodial interrogations create "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." [10] To ameliorate those inherent pressures and safeguard the Fifth Amendment right against self-incrimination, *Miranda* "imposed on the police an obligation to follow certain procedures in their dealings with the accused." [11]

As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to

9. The emphasis is supplied.

10. *Miranda v. Arizona,* 384 U.S. at 467, 86 S.Ct. 1602.

11. *Moran v. Burbine,* 475 U.S. 412, 420, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.[12]

■■■ The two-part test to determine whether a suspect has effectively waived his or her Fifth Amendment *Miranda* rights, set forth in *Moran v. Burbine*,[13] is stated as follows:

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.[14]

When the admission of a custodial interrogation statement is challenged, the burden is on the State to demonstrate by a preponderance of the evidence that the suspect's *Miranda* rights have been waived.[15]

## Miranda *Rights Waived*

■■■ Hubbard does not contest the voluntariness of his statements under the first part of the *Moran* test for waiver. Hubbard's sole contention is that he did not understand his *Miranda* rights and the consequences of waiving them. For a waiver to withstand judicial scrutiny under the second part of the *Moran* test, the defendant must comprehend the "plain meaning of his basic *Miranda* rights."[16] In analyzing the second part of the *Moran* test, the totality of the circumstances must be examined, including "the behavior of the interrogators, the conduct of the defendant, his age, his intellect, his experience, and all other pertinent factors."[17]

Hubbard's first argument is that he "did not have a full awareness of the nature of the rights he was abandoning and the consequences of that important decision to abandon those rights." According to Hubbard, Detective Leccia's recitation of his *Miranda* rights, in approximately twenty-one seconds, was "rushed and haphazard." Hubbard also argues that Detective Leccia failed to affirmatively ascertain whether Hubbard wanted to give a statement before he proceeded with questioning. In support of the latter contention, Hubbard notes that Detective Leccia did not advise him of his *Miranda* rights in writing and did ask him to sign a written waiver of those rights. Accordingly, Hubbard contends that the waiver of his *Miranda* rights was invalid.

---

12. *Miranda v. Arizona*, 384 U.S. at 444, 86 S.Ct. 1602.

13. *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

14. *Id.* at 421, 106 S.Ct. 1135.

15. *Miranda v. Arizona*, 384 U.S. at 475, 86 S.Ct. 1602; *DeJesus v. State*, 655 A.2d 1180, 1192 (Del.1995).

16. *Bennett v. State*, 992 A.2d 1236 at *3 (Del. Mar. 18, 2010).

17. *Whalen v. State*, 434 A.2d 1346, 1351 (Del. 1981); *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).

■ The United States Supreme Court has held that there is no "precise formulation" necessary to satisfy the requirements of *Miranda's* procedural safeguards.[18] Although Detective Leccia's recitation of Hubbard's *Miranda* rights did not take very long, Hubbard has cited no authority that requires *Miranda* to be given at a certain pace. There is no doubt that written *Miranda* waivers are a best police practice.[19] They are not required, however, as a matter of law.[20] The best evidence of a valid waiver of *Miranda* rights is a videotaped recording and that is what the State presented in Hubbard's case.

■ Pursuant to the holding in *Miranda,* before questioning suspects in custody, law enforcement officials must inform them that: they have the right to remain silent; their statements may be used against them at trial; they have the right to the presence of an attorney during questioning; and if they cannot afford an attorney, one will be appointed for them.[21] That information does not have to be stated exactly as it is written in the *Miranda* opinion. However, law enforcement officials must convey the complete substance of *Miranda's* safeguard to a suspect.[22]

The record reflects that the *Miranda* warnings recited by Detective Leccia at the outset of the videotaped interview informed Hubbard about all of the procedural safeguards required by the holding in *Miranda:* "[the] right to remain silent,

that any statement he does make may be used against him and that he has the right to the presence of an attorney, either retained or appointed." [23] The record also reflects that not only were the *Miranda* warnings conveyed to Hubbard by Detective Leccia, but that Hubbard affirmatively acknowledged that he understood his rights.

Detective Leccia then asked Hubbard "with your rights in mind do you wanna talk to me?" Hubbard responded "I was with a girl." Detective Leccia then asked Hubbard for clarification of that answer: "[S]o that's a yes you'll talk to me[?]" and Hubbard replied, "Yeah. I was with a girl. Yeah." Hubbard then proceeded to answer several hundred questions posed by Detective Leccia. Ultimately, during the course of the interrogation, Hubbard admitted his involvement in the crime.

■ The record establishes that the warnings given to Hubbard by Detective Leccia were adequately conveyed. After the warnings were given, Hubbard stated that he understood his rights. The Superior Court reviewed the videotape in which the warnings were given, which enabled the Superior Court to evaluate Detective Leccia's recitation of those warnings and Hubbard's response to those warnings. In addition to reviewing the videotape of the interview, the Superior Court was entitled to consider Hubbard's age, intellect, and

---

18. *Florida v. Powell,* —— U.S. ——, 130 S.Ct. 1195, 1204, 175 L.Ed.2d 1009 (2010).

19. *See id.* at 1204–05 (waiver form stating that defendant had both "the right to talk to a lawyer before answering any ... questions" and "the right to use any of these rights at any time ... during this interview" reasonably conveyed defendant's "right to have an attorney present, not only at the outset of interrogation, but at all times").

20. Compare *State v. Casto,* 375 A.2d 444, 449 (Del.1977) (holding that a written waiver is required prior to the acceptance of a guilty plea in any criminal case in the Justice of the Peace Court.).

21. *Miranda v. Arizona,* 384 U.S. at 444, 86 S.Ct. 1602.

22. *Id.* at 467, 86 S.Ct. 1602.

23. *Id.* at 444, 86 S.Ct. 1602.

experience in the criminal justice system.[24] At the time of his arrest, Hubbard was twenty-seven years old and had significant experience with the criminal justice system. The record indicates that Hubbard made an express waiver of his *Miranda* rights by his words and his actions.[25]

### Hubbard was Competent to Waive his Miranda Rights

■ The State has the burden of showing that not only did Hubbard make an express waiver of his *Miranda* rights, but that he "knowingly and intelligently waived those rights."[26] Hubbard's final argument is that Detective Leccia failed to inquire whether Hubbard was competent to understand the rights he was waiving and the consequences of such a waiver. According to Hubbard, Detective Leccia was under an obligation to inquire into Hubbard's competency after Hubbard admitted to drug and alcohol use the prior night.

■ This Court has recognized that prior intoxication does not, *per se*, invalidate an otherwise proper waiver of *Miranda* rights.[27] Instead, the appropriate inquiry is "whether [defendant] had sufficient capacity to know what he was saying and to have voluntarily intended to say it."[28] In *Howard v. State*, this Court found that a defendant, who had been intoxicated nine hours earlier, was sufficiently competent to waive his *Miranda*

rights.[29] In affirming the admission of the defendant's custodial statement in Howard, this Court held that "[t]he detailed nature of the statement and his recollection of his arrest belie any suggestion that his mental capacity was impaired when he was questioned."[30] In addition, this Court noted that the defendant's "selective admissions and denials" in his statement were also indicative of his capacity and intent.[31] Accordingly, in *Howard*, the defendant was found to have knowingly and intelligently waived his *Miranda* rights.[32]

Similarly, in Hubbard's case, the record reflects that Hubbard possessed the requisite mental capacity to waive his *Miranda* rights. Hubbard was interrogated at approximately 1:00 p.m. on June 25, 2009 by Detective Leccia. At the start of the interview, Hubbard told Detective Leccia that he was under the influence of drugs and alcohol the night prior. That statement was made at the same time in the interview when Hubbard was giving Detective Leccia false accounts of his activities during the prior evening.

At no point during the interview did Hubbard claim to be presently under the influence of drugs or alcohol. After reviewing the videotape of the interrogation, the Superior Court found that "if [Hubbard] was under the influence, it wasn't affecting his ability to communicate and to understand and appreciate what was going on." The record supports the Superior

---

**24.** *Whalen v. State*, 434 A.2d at 1351.

**25.** Acts that are inconsistent with a defendant's exercise of his or her *Miranda* rights are deemed to be "a deliberate choice to relinquish the protection those rights afford." *Berghuis v. Thompkins*, —— U.S. ——, 130 S.Ct. 2250, 2262, 176 L.Ed.2d 1098 (2010).

**26.** *Howard v. State*, 458 A.2d 1180 (Del.1983).

**27.** *Traylor v. State*, 458 A.2d 1170, 1176 (Del. 1983).

**28.** *Id.*

**29.** *Howard v. State*, 458 A.2d 1180 (Del.1983).

**30.** *Id.* at 1183.

**31.** *Id.*

**32.** *Id.*

Court's determination that Hubbard was competent to waive his *Miranda* rights.[33]

### Conclusion

The State met its burden of demonstrating that Hubbard was competent and waived his *Miranda* rights.[34] The motion to suppress the admission of Hubbard's statement into evidence was properly denied. The judgments of the Superior Court are affirmed.

33. *See id.* *See also U.S. v. Harris,* 44 F.3d 1206, 1210 (3d Cir.1995) (confession voluntary despite defendant's recent consumption of 40 ounces of malt liquor because no credible evidence defendant was under the influence).

34. *See Miranda v. Arizona,* 384 U.S. at 479, 86 S.Ct. 1602 (absent proof that proper warnings were given and valid waiver of rights was made by the accused, evidence obtained through custodial interrogation is inadmissible at trial).