**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| **STATE OF DELAWARE** | ) | |
| | ) | |
| **v.** | ) | **I.D. 2405003475** |
| | ) | |
| **JYAIRE HENRY,** | ) | |
| Defendant. | ) | |

Submitted: August 1, 2025
Decided: October 31, 2025
Corrected: November 3, 2025

*Upon Defendant Jyaire Henry's Motion to Suppress,*
**DENIED.**

## ORDER

**HAVING FULLY CONSIDERED** Defendant Jyaire Henry's Motion to Suppress (D.I. 10) and its supplement (D.I. 22); the State's Responses thereto (D.I. 16, 24); the parties' arguments upon the hearing of the motion (D.I. 18); the authorities cited; the applicable caselaw and governing rules; and the entire record developed thus far; it appears to the Court that:

### I. FACTUAL AND PROCEDURAL BACKGROUND

(1)     Mr. Henry has been indicted for attempted murder and two other related counts.[1]  These charges arise from an April 2024 altercation that resulted in a

---

[1]    D.I. 5 (Indictmnet).

stabbing.[2]  On August 16, 2024, the Wilmington Police Department (WPD) took Defendant Jyaire Henry into custody and he was placed in an interview room at the station.[3]  Once there, Mr. Henry wasn't acting normally.[4]  Among other behavior, he wouldn't sit still, would kneel and lie on the floor, and at times was panting, gasping, and clutching his chest.[5]

(2)    When WPD Detective Thomas Rittenhouse first interacted with him in the interview room at 7:11 a.m., Mr. Henry's "behavior was erratic," "[h]e was moving all over the interview room and started to complain of a medical issue with his chest."[6]  Once this began, detectives asked Mr. Henry about his health—he reported a history of a heart condition—and contacted Mr. Henry's family to confirm whether he did indeed have such history.[7]

(3)    Though Mr. Henry's mother told Det. Rittenhouse she was not aware of Mr. Henry having any heart condition, the detective contacted Emergency Medical Services to have him assessed at the station and transported to the hospital.[8]

---

[2]   *Id.*; May 21, 2025, Supp. Hr'g. Tr. at 6, 15-16 (D.I. 20).

[3]   Supp. Hr'g. Tr. at 6.

[4]   *Id.* at 6-7.

[5]   *Id.* at 7-8; May 21, 2025, Supp. Hr'g. Exh. 1 at Ex. A (Video Recording of WPD Interview Room 2, Aug. 16, 2024), at 07:11:56—07:16:13 (hereinafter "Int. Rm. Video A") (D.I. 18).

[6]   Supp. Hr'g. Tr. at 6-7; Int. Rm. Video A, at 07:16:15—07:28:35.

[7]   Supp. Hr'g. Tr. at 7; Int. Rm. Video A. at 07:16:16—07:26:40.

[8]   Supp. Hr'g. Tr. at 7-8; Int. Rm. Video A. at 07:28:54—07:37:04.

Mr. Henry left for the hospital at 7:37 a.m.[9]  Det. Rittenhouse rode along with him in the ambulance.[10]

(4)    While at the hospital, Mr. Henry was administered "5 mg of [D]roperidol and Versed intramuscularly to help with chemical sedation in addition to physical sedation given his severe level of agitation and combativeness."[11]  The hospital staff determined "[t]his was necessary for both the safety of [Mr. Henry] and the safety of the staff."[12]  This medication was administered at approximately 7:50 a.m.[13]

(5)    Droperidol and Versed were the medications used by medical staff for sedation during Mr. Henry's hospital visit.[14]  It appears the primary purpose of these medications is to induce sedation in patients and reduce anxiety and agitation.[15]

---

[9]    Int. Rm. Video A. at 07:37:04—07:38:35.

[10]   Supp. Hr'g. Tr. at 8-9.

[11]   May 21, 2025, Supp. Hr'g. Exh. 1 at Ex. C (Def.'s CCHS Treatment Record, Aug. 16, 2024), at 2 (hereinafter "Def.'s CCHS Treatment Record") (D.I. 18).

[12]   *Id.*

[13]   Supp. Hr'g. Tr. at 9-10.

[14]   Def.'s CCHS Treatment Record at 2. Both sides agree that Mr. Henry was given Droperidol and Versed to reduce his agitation. *See* Def.'s Mot. to Suppress at ¶ 6 (D.I. 10); State's Resp. to Def.'s Mot. to Suppress at 2-3, 5 (D.I. 16).

[15]   Neither Mr. Henry nor the State have produced expert testimony or like opinion or evidence related to these medications and their use or effect in Mr. Henry's case.  Thus, the Court relies on the parties' seeming agreement that it can limit its consideration to the sources they cite. *Compare* Def.'s Suppl. Br. (D.I. 22) *with* State's Suppl. Br. (D.I. 24). The parties relied primarily on the following: *Droperidol*, DRUGS.COM, https://www.drugs.com/mtm/droperidol.html (last visited Oct. 30, 2025) ; *Versed*, DRUGS.COM, https://www.drugs.com/mtm/versed.html (last visited Oct. 30, 2025); AMERICAN REGENT, INC., MANUFACTURER'S INSERT: DROPERIDOL INJECTION, https://www.americanregent.com/media/ 1574/droperidol_prescribing-information.pdf (Def.'s

Droperidol's effects typically last two to four hours, but may persist for as long as twelve hours.[16] And Versed's effects typically last for two hours, but may persist for up to six hours.[17]

(6) Mr. Henry was discharged from Wilmington Hospital at 11:09 a.m. after he "recovered appropriately from his chemical sedation," "ha[d] no complaints," and "state[d] he feels better."[18]

(7) He was then taken back to WPD headquarters.[19] Upon arrival, he was returned to the WPD turnkey area.[20] Det. Rittenhouse briefed the turnkey officer on Mr. Henry's medical situation and gave him the documentation provided by Wilmington Hospital.[21] Mr. Henry confirmed for the turnkey officer that he was "okay."[22] By this point, Mr. Henry was acting normally and inquiring about his

Suppl. Br., Ex. D); HOSPIRA, MANUFACTURER'S INSERT: MIDAZOLAM INJECTION (Jan. 2023) (Def.'s Suppl. Br., Ex. E); and the Prescribers' Digital Reference, the digital version of the venerable Physicians' Desk Reference or PDR available at https://pdr.net (last visited Oct. 30, 2025).

[16] *Droperidol*, DRUGS.COM, https://www.drugs.com/mtm/droperidol.html (last visited Oct. 30, 2025); AMERICAN REGENT, INC., MANUFACTURER'S INSERT: DROPERIDOL INJECTION, https://www.americanregent.com/media/ 1574/droperidol_prescribing-information.pdf (Def.'s Suppl. Br., Ex. D).

[17] *Versed*, DRUGS.COM, https://www.drugs.com/mtm/versed.html (last visited Oct. 30, 2025); HOSPIRA, MANUFACTURER'S INSERT: MIDAZOLAM INJECTION (Jan. 2023) (Def.'s Suppl. Br., Ex. E).

[18] Def.'s CCHS Treatment Record at 2.

[19] Suppression Hr'g. Tr. at 10-12.

[20] *Id.* at 12.

[21] *Id.* at 12-13.

[22] *Id.*

charges.[23]

(8) In the ensuing couple of hours, Det. Rittenhouse completed reports and warrants related to the morning's incidents.[24] During his fingerprinting, Mr. Henry began to ask about the specific charges he faced.[25] Det. Rittenhouse explained that in order to discuss those Mr. Henry would have to return to the interview room for a *Mirand*ized statement.[26] Mr. Henry "agreed that he'd like to come and waive his *Miranda* rights and speak with [Det. Rittenhouse] upstairs."[27]

(9) At approximately 1:50 p.m., Detective Rittenhouse and Mr. Henry returned to the interview room where the detective read Mr. Henry his *Miranda* rights and questioned him in furtherance of the attempted murder investigation.[28] Mr. Henry waived his *Miranda* rights and gave the 23-minute statement that he now seeks to have suppressed.[29]

## II. PARTIES' CONTENTIONS

(10) According to Mr. Henry, the statement he gave to Detective

---

[23] *Id.*

[24] *Id.* at 13-14.

[25] *Id.* at 13-14.

[26] *Id.* at 13-14. *See Miranda v. Arizona*, 384 U.S. 436 (1966) (articulating the procedural safeguards that secure one's the privilege against self-incrimination when subject to custodial interrogation).

[27] *Id.* at 14.

[28] May 21, 2025, Supp. Hr'g. Exh. 1 at Ex. B (Video Recording of WPD Interview Room 2, Aug. 16, 2024), at 13:50:11—13:51:23 (hereinafter "Int. Rm. Video B") (D.I. 18).

[29] Suppression Hr'g. Tr. at 15; Int. Rm. Video B at 13:50:11—14:03:44.

Rittenhouse should be suppressed because he did not have the capacity to knowingly and intelligently waive his *Miranda* rights. He focuses on three factors in the totality-of-circumstances analysis the Court must employ:[30] (a) the behavior and conduct of Detective Rittenhouse; (b) his own behavior and conduct both before and after his hospital visit; and (c) his age and claimed relative inexperience with the criminal justice system.[31]

(11)  Mr. Henry insists the behavior and conduct of Det. Rittenhouse is "especially telling" in this totality-of-circumstances examination.[32]  In support of this, Mr. Henry first points to Det. Rittenhouse' awareness that Mr. Henry had been medically sedated approximately six hours before he waived *Miranda* and gave his statement.[33]  Second, he criticizes Det. Rittenhouse's desire to wait to speak with Mr. Henry until after he was discharged from the hospital where he would have a "second opportunity to *Miranda*ize [Mr. Henry]."[34]  Third, he calls out Det. Rittenhouse's interrogation techniques.[35]

---

[30]  *See Hubbard v. State*, 16 A.3d 912, 916-19 (Del. 2011) (adopting and applying the United States Supreme Court's test set forth in *Moran v. Burbine*, 475 U.S. 412 (1986), to a claim that the defendant wasn't—due to drug and alcohol use—competent to understand the *Miranda* rights he was waiving and the consequences of such a waiver).

[31]  *See generally* Def.'s Mot. to Suppress at ¶¶ 16-20; *see also Hubbard*, 16 A.3d at 917.

[32]  Def.'s Mot. to Suppress at ¶ 16; Def.'s Suppl. Br. at 7-9.

[33]  Def.'s Mot. to Suppress at ¶ 16; Def.'s Suppl. Br. at 7-9.

[34]  Def.'s Mot. to Suppress at ¶ 16; Def.'s Suppl. Br. at 7-9.

[35]  Def.'s Mot. to Suppress at ¶ 16; Def.'s Suppl. Br. at 7-9.

(12) Mr. Henry claims that he was likely still under the influence of the medications administered at the hospital when he waived his *Miranda* rights.[36] He avers that he appears "drowsy and lethargic in his second interview and ha[d] to be told to provide a verbal 'yes' to Detective Rittenhouse's questions."[37]

(13) Mr. Henry posits that his age and professed relative inexperience with the criminal justice system are also factors that weigh against a finding of requisite capacity.[38]

(14) In response, the State argues that Mr. Henry had adequate capacity.[39] It highlights that the hospital found that he was properly recovered, his erratic behavior had ceased, and he was alert and attentive during the challenged interrogation.[40] The State also views Mr. Henry's previous arrests and conviction history as weighing in its favor in this analysis.[41]

### III. APPLICABLE LEGAL STANDARDS

(15) Prior to any custodial interrogation, the police must advise one of certain rights against self-incrimination as prescribed in *Miranda v. Arizona*.[42] After

---

[36] Def.'s Mot. to Suppress at ¶¶ 17-19.

[37] *Id.* at ¶ 18.

[38] Def.'s Mot. to Suppress at ¶ 20.

[39] *See generally* State's Resp.

[40] State's Resp. at 5-6.

[41] State's Resp. at 6.

[42] 384 U.S. at 436, 444-45 (1966).

being advised of such rights, that person is free to waive them.[43]  To effectively waive the *Miranda* rights, it is required that:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.[44]

(16)   Here, the State bears the burden of showing, by a preponderance of evidence, that "not only did [Mr. Henry] make an express waiver of his *Miranda* rights, but that he 'knowingly and intelligently waived those rights.'"[45]

(17)   When capacity is questioned, the Court must look to the totality of the circumstances, "including 'the behavior of the interrogators, the conduct of the defendant, his age, his intellect, his experience, and all other pertinent factors."[46] Fundamental to this inquiry is, "whether [the interrogatee] had sufficient capacity to know what he was saying and to have voluntarily intended to say it."[47]

(18)   Even were one deemed to be intoxicated during interrogation, such fact "does not *per se* invalidate an otherwise proper waiver of rights."[48]  But "[o]nly if

---

[43]   *Id.* at 444-45.

[44]   *Moran*, 475 U.S. at 421.

[45]   *Hubbard*, 16 A.3d at 919 (citing *Howard v. State*, 458 A.2d 1180 (Del. 1983)).

[46]   *Id.* at 917 (quoting *Whalen v. State*, 434 A.2d 1346, 1351 (Del. 1981)).

[47]   *Traylor v. State*, 458 A.2d 1170, 1176 (Del. 1983).

[48]   *Id.*; *Howard*, 458 A.2d at 1183.

the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived."[49]

## IV. ANALYSIS

(19) After reviewing the record and examining the totality of the circumstances, the Court finds that Mr. Henry had the capacity to enter a knowing, intelligent, and voluntary waiver of his *Miranda* rights. First, the conduct and behavior of Det. Rittenhouse wasn't improper or overbearing. Next, the conduct and behavior of Mr. Henry indicates that—at the time he ultimately gave his statement on the afternoon of August 16, 2024, he was able to fully understand and validly waive his *Miranda* rights.[50] His ability to comprehend statements and questions, challenge the detective on certain things, recall specific details of events, and intelligently answer questions belie any contention that he did not have the capacity to waive his *Miranda* rights.[51] Last, Mr. Henry's age and criminal justice experience provide no support for the notion that he was unable to "comprehend the 'plain meaning of his basic *Miranda* rights.'"[52]

---

[49] *State v. Revel*, 2016 WL 5409032, at *5 (Del. Super. Ct. Sept. 26, 2016) (quoting *Marine v. State*, 607 A.2d 1185, 1195 (Del. 1992) (citing *Moran*, 475 U.S. at 421)).

[50] Suppression Hr'g. Tr. at 15-18.

[51] *Id.*; Int. Rm. Video B at 13:50:11—14:03:44.

[52] Def.'s Mot. to Suppress at ¶ 20; *Hubbard v. State*, 16 A.3d 912, 917 (Del. 2011) (quoting *Bennett v. State*, 2010 WL 987025, at *3 (Del. March 18, 2010)).

**A. There is nothing about Det. Rittenhouse's conduct or behavior that weighs in favor of invalidating Mr. Henry's waiver of his *Miranda* rights.**

(20) In Mr. Henry's view, Det. Rittenhouse's behavior and conduct—a consideration in the *Hubbard-Moran* totality of the circumstances analysis—is an "especially telling" factor in his favor.[53] Not so.

(21) Mr. Henry first points out that Det. Rittenhouse accompanied Mr. Henry to the hospital and was present when Mr. Henry was medically sedated.[54] He posits "that Detective Rittenhouse would have been aware of [Mr. Henry's] ability to know what he was saying and have voluntarily intended to say may have been compromised."[55] In support of this, Mr. Henry distinguishes Det. Rittenhouse's firsthand knowledge of his medical sedation from *Hubbard*— "where the defendant [only] told the officer he was voluntarily intoxicated the night before."[56]

(22) But the fact that Det. Rittenhouse was aware that Mr. Henry had been medically sedated earlier in the day "is irrelevant to the question of the intelligence and voluntariness of [Mr. Henry's] election to abandon his rights."[57] Indeed, in this instance, Det. Rittenhouse's firsthand witnessing of Mr. Henry's previous erratic

---

[53] *See* Def.'s Mot. to Suppress at ¶ 16.

[54] *Id.*; Def.'s Suppl. Br. at 8.

[55] Def.'s Mot. to Suppress at ¶ 16.

[56] *Id.*

[57] *Moran*, 475 U.S. at 423.

behavior, medical treatment, and changed ability to cogently and calmly communicate demonstrate a more fully informed understanding of his capacity when questioned that afternoon.

(23)   Mr. Henry also asks the Court to consider "Detective Rittenhouse's choice to wait to speak with Mr. Henry until he had 'a second opportunity to Mirandize him', and to press him about details of the incident in hopes of obtaining a confession."[58]

(24)   As the Court in *Miranda v. Arizona* recognized, "custodial interrogations, by their very nature, generate 'compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'"[59]   This is, in part, why the police must always advise a person of their *Miranda* rights prior to a custodial interrogation.[60]

(25)   It was wholly appropriate that Det. Rittenhouse waited to speak with Mr. Henry until after his medical treatment.  The recording of their first interaction in the morning and recounting of the trip to the hospital demonstrate clearly that Mr. Henry should not have been interviewed until that occurred.

(26)   When Det. Rittenhouse did *Mirandize* Mr. Henry, he "read off a

---

[58]   Def.'s Suppl. Br. at 9.

[59]   *Moran*, 475 U.S. at 420 (quoting *Miranda*, 384 U.S at 467).

[60]   *See Miranda*, 384 U.S. at 444-45.

*Miranda* form," asked Mr. Henry if he understood those rights, and received a verbal confirmation.[61] There is no indication that any of Det. Rittenhouse's conduct either deprived Mr. Henry "of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them"[62] or was in any way untoward. To the contrary, the record demonstrates a prudent and cautious approach when dealing with Mr. Henry and ensuring recognition of his rights.

## B. Mr. Henry's conduct after his hospital visit evidences his capacity was unimpaired.

(27) Mr. Henry asserts that his "conduct after returning from the hospital, in comparison with his conduct prior to being taken to the hospital is compelling evidence that he did not have the capacity to waive his *Miranda* rights."[63] But, the circumstances around the return of Mr. Henry to the police station and video evidence of the statement itself say quite the opposite.

(28) Mr. Henry's discharge records and subsequent interactions with the WPD turnkey officer and Det. Rittenhouse prior to the custodial interview demonstrate his capacity was not impaired.[64] Mr. Henry's medical records indicate,

---

[61]  Suppression Hr'g. Tr. at 17; Int. Rm. Video B at 13:50:11—13:51:23. *See Hubbard*, 16 A.3d at 918 (explaining that while "written *Miranda* waivers are a best police practice . . . [t]hey are not required, . . . as a matter of law").

[62]  *Moran*, 475 U.S. at 424.

[63]  Def.'s Mot. to Suppress at ¶ 17.

[64]  *See* Suppression Hr'g. Tr. at 12-15; Def.'s CCHS Treatment Record at 2.

at the time of discharge, he "ha[d] no complaints [and] state[d] he [felt] better" and that he "recovered appropriately from his chemical sedation."[65]  After Mr. Henry was discharged from the hospital, he was brought to the WPD turnkey area where he spoke with a turnkey officer.[66]  Mr. Henry informed the turnkey officer that he was okay.[67]

(29)  During processing, Mr. Henry asked Det. Rittenhouse about the charges against him.[68]  When Det. Rittenhouse informed him that one of those charges was attempted murder, he told the detective "that's not right."[69]  Mr. Henry agreed at that time that he wished to speak with Det. Rittenhouse and would waive his *Miranda* rights.[70]  While walking to the interview room,  Mr. Henry continued "to talk about how it was crazy that it was attempted murder without going into details specifically about it."[71]

(30)  Prior to his medical treatment, Mr. Henry was no doubt in either emotional or physical distress.[72]  When Mr. Henry was returned to the station, he

---

[65]  Def.'s CCHS Treatment Record at 2.

[66]  *Id.* at 12-13.

[67]  *Id.*

[68]  *Id.* at 14.

[69]  *Id.*

[70]  *Id.*

[71]  *Id.* 14-15.

[72]  *See* Int. Rm. Video A at 07:11:56—07:37:04.

- 12 -

appeared more relaxed and "normal" in his interactions with Det. Rittenhouse.[73] He was responsive to questions and asked questions of his own.[74] While his demeanor is undisputably calmer, it's not at all "drowsy and lethargic" as Mr. Henry makes it out to be.

### C. Mr. Henry's interactions with Det. Rittenhouse during his statement demonstrate his capacity was unimpaired.

(31)   After arriving at the interview room, Det. Rittenhouse read Mr. Henry his *Miranda* rights and Mr. Henry verbally agreed to waive them.[75] Mr. Henry's responses to Det. Rittenhouse questions are particularly indicative of Mr. Henry's ability to knowingly and intelligently waive his *Miranda* rights.

(32)   Instructive here is *Traylor v. State*.[76] In *Traylor*, the Court found that the defendant's responses to interview questions, which were specific in nature, and his ability to recall his arrest and interrogation, "negate[d] any implication that his mental capacity was impaired when he was questioned."[77] Same here:

> (a) Mr. Henry was able to readily recall various events and his statements and responses to Det. Rittenhouse's questions were specific in nature.

---

[73] *See* Suppression Hr'g. Tr. At 12-15; *id.* at 15 (noting though that "Mr. Henry was having some nervousness with his legs where he was moving his legs a little bit while during the questioning.").

[74] Suppression Hr'g. Tr. At 12-15.

[75] Suppression Hr'g. Tr. at 15, 17; Int. Rm. Video B at 13:50:11—13:51:23.

[76] 45 A.2d 1170, 1176 (Del. 1983).

[77] *Id.*

(b) Mr. Henry "was able to recall various incidents involving his ex-girlfriend, involving the stabbing, as well as other points about what had occurred through each of those events."

(c) Mr. Henry was able to recall "how he knows the individual, who he stabbed, he understood about the stabbing and why he was being questioned about it." He described specific details, such as a concealed firearm he observed on the victim.

(d) Mr. Henry was able to recall and describe the direction of travel he took after the event "as well as what he did with the weapon after he was in possession of it."

(e) Moreover, when questioned by Det. Rittenhouse about a knife recovered by WPD during the arrest, Mr. Henry was able to recall the knife in question and indicated that it was not the knife used in the stabbing. Mr. Henry was able to describe that the knife recovered during the arrest was a work knife and "gave [Det. Rittenhouse] an explanation of what he used that knife for." [78]

(33) All of Mr. Henry's responses to Det. Rittenhouse's questions were specific in nature and he was able to cogently recall and corroborate details and events. His demeanor—which was wholly normal, if somewhat understandably nervous—and ability to give these responses during his interview with Det. Rittenhouse belie any suggestion that his mental capacity was impaired at the time he waived his *Miranda* rights.[79]

---

[78] Suppression Hr'g. Tr. at 15-17; Int. Rm. Video B at 13:50:11—14:03:44.

[79] *See Traylor*, 45 A.2d at 1176.

- 14 -

**D. Mr. Henry was neither too young nor inexperienced to understand and waive his *Miranda* Rights**

(34) Mr. Henry claims his "age and relative inexperience with the criminal justice system" suggest Mr. Henry "did not have the capacity to execute a knowing, intelligent, and voluntary waiver of his *Miranda* rights."[80]

(35) At the time of this encounter, Mr. Henry was 22 years-old[81] and already had a criminal history dating back almost a decade.[82] His adult record included convictions for one felony-resisting arrest and two misdemeanors—disorderly conduct and terroristic threatening.[83] His juvenile record also includes three misdemeanor adjudications.[84] It appears that, in all, Mr. Henry had been arrested no less than a dozen times between November 2014 and August 2024.[85]

(36) This Court has had occasion to consider *Miranda* challenges by defendants of similar age and experience with the criminal justice system. For instance, in *State v. Peters*, the Court noted "though [the defendant] was only twenty-one years old, he had significant experience with the criminal justice system—both

---

[80] Def.'s Mot. to Suppress at ¶ 20.

[81] Def.'s Suppl. Br., Ex. A (Def.'s DELJIS Criminal History) at 1 (documenting Mr. Henry's date of birth as September 16, 2001); Int. Rm. Video A. at 07:16:58—07:17:07.

[82] Def.'s DELJIS Criminal History at 9.

[83] Def.'s DELJIS Criminal History at 1.

[84] *Id.*

[85] *Id.* at 2-9.

as a juvenile and as an adult."[86] Just as in *Peters*, Mr. Henry's age and relative experience weigh in favor of his capacity to understand and waive his *Miranda* rights.

(37) Mr. Henry further suggests that Det. Rittenhouse's "involvement of [Mr. Henry's] mother, even though [Mr. Henry] is a legal adult, speaks to [Mr. Henry's] youth and relative inexperience."[87] But, the primary purpose for Det. Rittenhouse's phone call to Mr. Henry's mother was to determine any prior heart issues Mr. Henry may have had at the time he was complaining of such.[88] In this circumstance, Det. Rittenhouse's conversation with Mr. Henry's mother lends nothing to his claimed lacked of ability to understand and provide a valid waiver of his *Miranda* rights. While it appears that Mr. Henry's mother told the detective that Mr. Henry had a prior mental health history,[89] there is nothing in the record indicating that such prior history impaired his ability to properly waive his *Miranda* rights.

(38) The relevant question here is whether Mr. Henry's age and claimed inexperience affected his ability to "comprehend the 'plain meaning of his basic

---

[86] 283 A.3d 668, 683 (Del. Super. Ct. 2022), *aff'd*, 2023 WL 3880124 (Del. June 7, 2023).

[87] Def.'s Mot. to Suppress at ¶ 20.

[88] Suppression Hr'g. Tr. at 23-25.

[89] Suppression Hr'g. Tr. at 25.

- 16 -

*Miranda* rights.'"[90]  The Court finds that Mr. Henry was not so young and his experience was not so limited to the extent that he was unable to do so.  Moreover, in the totality of the circumstances, any effect Mr. Henry's age or claimed limited experience may have had, is negated by his demonstrated ability to comprehend and intelligently respond to questions asked by Det. Rittenhouse during the custodial interrogation.[91]

## V. CONCLUSION

(39)   After considering the totality of the circumstances, the Court finds that the State has met its burden of establishing that Mr. Henry had the capacity to enter a knowing, intelligent, and voluntary waiver of his *Miranda* rights prior to giving his custodial statement on the afternoon of August 16, 2024.  Resulting, Defendant Jyaire Henry's Motion to Suppress that statement is **DENIED**.

**IT IS SO ORDERED.**

/s/ Paul R. Wallace

_____

Paul R. Wallace, Judge

---

[90]  *Hubbard*, 16 A.3d at 917 (quoting *Bennett*, 2010 WL 987025 at *3).

[91]  *See* Suppression Hr'g. Tr. at 15-18.